UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WELLS FARGO AND CO., et al.,

    Plaintiffs,

    v.

ABD INSURANCE AND FINANCIAL SERVICES, et al.,

    Defendants.
_____/

No. C 12-3856 PJH

**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION**

Before the court is plaintiffs' motion for preliminary injunction. Having read the parties' papers and carefully considered their arguments, and the relevant legal authority, the court DENIES plaintiffs' motion as follows.

## BACKGROUND

Plaintiffs Wells Fargo & Co. and Wells Fargo Insurance Services ("Wells Fargo" or "plaintiffs") bring this lawsuit against defendants ABD Insurance & Financial Services (doing business as "The ABD Team"), Kurt de Grosz, and Brian Hetherington (collectively, "ABD" or "defendants") arising out of the alleged misappropriation of the "ABD" name and trademark. Wells Fargo asserts five causes of action against ABD: (1) violation of the Lanham Act for infringing Wells Fargo's "ABD" trademark rights and associated marketplace confusion; (2) violation of the Lanham Act for false and misleading descriptions of fact in connection with advertising of ABD; (3) common law trademark infringement based on use of the "ABD" mark; (4) unfair competition under California Business & Professions Code section 17200 for ABD's use of the "ABD" mark and misrepresentation of a common identity with Wells Fargo; and (5) false advertising under California Business & Professions Code section 17500 for false and misleading

descriptions of fact in connection with ABD's advertising or promotion.

The "ABD" mark was first used by the company Alburger Basso de Grosz Insurance Services, which was founded in 1990, and which changed its name to "ABD Insurance and Financial Services" in 1997. In 2007, Wells Fargo acquired the company and all of its assets, including the "ABD" mark. In 2008, Wells Fargo changed the name of the "ABD" company to "Wells Fargo Insurance Services." The parties dispute to what extent Wells Fargo continued to use the "ABD" name after this name change; Wells Fargo claims that it continued to use the name with customers and potential customers, while ABD claims that Wells Fargo stopped using the "ABD" name for all relevant purposes. Regardless, it does appear that Wells Fargo did not keep its trademark registrations current with regard to the "ABD" mark.

Defendant de Grosz, the son of one of the original founders of ABD, worked at ABD between 1994 and 1999 (before it was acquired by Wells Fargo). In 2011, he learned that the "ABD" mark had been cancelled, and that Wells Fargo had not yet renewed the mark. In October 2011, de Grosz filed an "intent to use" the "ABD" mark, and placed a call to defendant Hetherington (who was then working for Wells Fargo Insurance Services) regarding his intent to use the "ABD" mark. The parties do not agree as to Wells Fargo's response to this call, but in any case, in June or July 2012, de Grosz filed a notice of intention to do business under the "ABD" name. Hetherington, having left Wells Fargo in January 2012, joined the new ABD company. On July 17, 2012, Wells Fargo sent a demand letter to de Grosz, asking that he abandon the pending trademark application, and putting him on notice of the claims asserted in this suit. After sending the letter, Wells Fargo also noticed that defendants were actively doing business under the "ABD" name, and that they had been operating a website and a LinkedIn site using that name. In late July 2012, approximately 75 former employees of Wells Fargo Insurance Services joined ABD. Wells Fargo claims that ABD has been using these employees to solicit Wells Fargo customers and to use Wells Fargo proprietary information.

Wells Fargo filed this suit on July 24, 2012. On July 31, 2012, Wells Fargo filed an

1  action in state court against six former employees of Wells Fargo Insurance Services who
2  joined ABD, alleging claims for breach of the duty of loyalty, intentional interference with
3  economic relationships, intentional interference with potential economic relationships, unfair
4  competition, conspiracy, and breach of contract.  In this suit, Wells Fargo contends that
5  ABD is creating confusion in the marketplace by using the "ABD" mark and by recruiting
6  former Wells Fargo employees.  On November 30, 2012, Wells Fargo filed this motion for
7  preliminary injunction.

**DISCUSSION**

9  A.    Legal Standard
10       A plaintiff seeking a preliminary injunction must establish that it is likely to succeed
11 on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief,
12 that the balance of equities tips in its favor, and that an injunction is in the public interest.
13 Winter v. Natural Resources Defense Council, Inc., 55 U.S. 7, 20 (2008).
14       Alternatively, the plaintiff may demonstrate that serious questions going to the merits
15 were raised and that the balance of hardships tips sharply in the plaintiff's favor,  "so long
16 as the plaintiff also shows that there is a likelihood of irreparable injury and that the
17 injunction is in the public interest." Alliance for Wild Rockies v. Cottrell, 632 F.3d 1127,
18 1135 (9th Cir. 2011).  A "serious question" is one on which the plaintiff has "a fair chance of
19 success on the merits." Sierra On-Line, Inc. v. Phoenix Software, Inc., 739 F.2d 1415,
20 1421 (9th Cir. 1984).
21       An injunction is a matter of equitable discretion and is "an extraordinary remedy that
22 may only be awarded upon a clear showing that the plaintiff is entitled to such relief."
23 Winter, 55 U.S. at 22.
24 B.    Plaintiffs' motion
25       Wells Fargo's motion centers around two main themes: (1) its own use of the "ABD"
26 mark after acquiring ABD Insurance and Financial Services in 2007; and (2) the allegedly
27 bad behavior of defendants in plotting to "appropriate" the "ABD" name and in recruiting
28 Wells Fargo employees to join defendants' company.  For reasons that will be discussed

3

more fully below, for the purposes of this motion, the court will focus on the first category; namely, Wells Fargo's use of the "ABD" mark.

Wells Fargo starts by explaining that it purchased ABD in 2007, "lock, stock, and barrel," which included the ABD name, its intellectual property, and all goodwill in the ABD brand. Wells Fargo claims that the latter was "conservatively" allocated at $270 million. After the purchase, Wells Fargo "continued to operate the ABD business as ABD" until 2009, when it "chose to focus its use of the ABD brand as secondary to the famous Wells Fargo brand." Wells Fargo changed the corporate name of ABD to "Wells Fargo Insurance Services," and changed any business material (such as business cards, letterhead, etc.) that used ABD "as the primary or sole entity name." However, Wells Fargo claims that the "ABD brand did not disappear," noting that its business cards, customer presentations, voicemail systems, and business faxes still reflected a "tie" between Wells Fargo and ABD (presumably, ABD was mentioned as a secondary name, as Wells Fargo has already stated that "ABD" was not used as the primary or sole entity name on any materials). Wells Fargo also maintains the ABD email domain, and redirects traffic from the ABD website to the Wells Fargo website.

After setting forth the factual background, Wells Fargo argues that all four of the Winter factors are met here, justifying a preliminary injunction against defendants, preventing them from continuing to use the "ABD" mark. Wells Fargo focuses its attention on the first Winter factor, the likelihood of success on the merits. While Wells Fargo argues that it is likely to succeed on each of its Lanham Act claims (for trademark infringement and false advertising), as well as its common law trademark and state law claims, the court will first address the Lanham Act trademark infringement claim.

Section 43(a) of the Lanham Act prohibits any person from using "any word, term, name, symbol, or device, or any combination thereof," which is "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1). In

4

order to prevail on its claim for trademark infringement under the Lanham Act, Wells Fargo must show that (1) it owns a valid trademark and (2) defendants' use of the mark is likely to cause confusion, mistake, or deception. See, e.g., Applied Information Sciences Corp. v. eBay, Inc., 511 F.3d 966, 969 (9th Cir. 2007).

As to the first prong, Wells Fargo points to its acquisition of ABD Insurance and Financial Services in 2007, which included acquisition of the ABD name. Defendants do not challenge the validity of Wells Fargo's initial acquisition, they instead argue that Wells Fargo abandoned the "ABD" name post-acquisition. Wells Fargo counters by arguing that, in order to show abandonment, defendants must show that Wells Fargo stopped using the trademark and intended not to resume such use in the future. See, e.g., Grocery Outlet, Inc. v. Albertson's Inc., 497 F.3d 949, 951 (9th Cir. 2007). Wells Fargo argues that it has "consistently used the ABD mark since acquiring it in 2007," and dismisses its corporate name change from "ABD Insurance and Financial Services" to "Wells Fargo Insurance Services" as "of no import." Rather than focus on the corporate name change, Wells Fargo urges the court to focus on its use of the "ABD" mark on "business cards, customer presentations, 'broker of record' letters, payment processing, voicemail messaging systems, and even business faxes."

As to the second prong, Wells Fargo explains that the "likelihood of confusion" analysis is guided by the eight factors set forth in AMF v. Sleekcraft Boats. 599 F.3d 341 (9th Cir. 1979). The Sleekcraft factors are:

(1) strength of the mark;

(2) proximity of the goods;

(3) similarity of the marks;

(4) evidence of actual confusion;

(5) marketing channels used;

(6) type of goods and the degree of care likely to be exercised by the purchaser;

(7) defendant's intent in selecting the mark;

(8) likelihood of expansion of the product lines.

5

Id. at 348-49.

As to factor (1), the strength of the mark, Wells Fargo argues that the "ABD" mark is fanciful or arbitrary, and is therefore entitled to strong protection, especially in light of its "extensive use and promotion for more than two decades."

As to factor (2), the proximity of the goods, Wells Fargo argues that this factor weighs heavily in its favor, as both Wells Fargo and defendants use the "ABD" mark to promote "identical insurance brokerage services."

As to factor (3), the similarity of the marks, Wells Fargo contends that the marks are identical and the manner in which they are being used is identical.

As to factor (4), Wells Fargo points to "numerous instances of actual confusion arising from defendants' use of ABD." Specifically, Wells Fargo points to four customer emails from July 2012, all containing questions regarding the link (if any) between Wells Fargo and the new ABD company. See Boyd decl., Exs. EE, HH, II, JJ. Wells Fargo also cites an instance, in August 2012, where an insurer was confused as to whether Wells Fargo or ABD was the broker of record for one of its customers. This confusion led to Wells Fargo losing the customer's account. Finally, in its reply brief, Wells Fargo contends that "actual confusion continues today," and cites to a January 2013 email from a law firm employee. Though Wells Fargo does not explain the contents or context of the email, it appears to be an email regarding a document subpoena that was served on ABD Insurance and Financial Services, Inc., in connection with a state court lawsuit. See second Boyd decl., Dkt. 78-1, Ex. A. In response to the subpoena, ABD returned a Certificate of No Records, and explained that it "picked up the [ABD] name but that Wells Fargo had the records." Id.

As to factor (5), Wells Fargo argues that it and defendants "use the exact same marketing channels to advertise, market, promote, and sell their products and services."

As to factor (6), the type of goods and the degree of care likely to be exercised by the purchaser, Wells Fargo hedges by arguing that the "measure of consumer care in the present case cannot be considered in a vacuum." According to Wells Fargo, "even in an

industry where consumers may be sophisticated and careful decision-makers," no amount of consumer care can prevent confusion between two companies with identical names.

As to factor (7), Wells Fargo contends that defendants intended to "hijack" the "ABD" mark as a way to "tap in to" the brand equity in the name. Wells Fargo hammers on this theme throughout its brief, even outside the context of the Sleekcraft factors. It argues that defendants "embarked on a brazen plan to steal that which Wells Fargo had bought" and refers to defendants' actions as "identity theft." Wells Fargo urges the court to "presume that defendants will achieve what they intended: public deception."

As to factor (8), likelihood of expansion of the product lines, Wells Fargo concedes that "this factor does not play a significant role in the likelihood of confusion analysis."

Apart from its trademark infringement claim under the Lanham Act, Wells Fargo also asserts trademark claims under common law and California state law, as well as false advertising claims under the Lanham Act and under state law. Wells Fargo concedes that its common law and state law trademark claims are "subject to the same legal standards as a Lanham Act trademark claim," making any separate discussion of those two claims unnecessary. Wells Fargo does briefly address its Lanham Act false advertising claim separately, but the court finds that the heart of the false advertising claim is duplicative of the Lanham Act trademark infringement claim. In other words, the key "misrepresentation" identified by Wells Fargo is defendants' representation of "their business as a continuation of the business that Wells Fargo purchased." Essentially, Wells Fargo is arguing that defendants' use of the "ABD" mark constitutes a false statement of fact that defendants are somehow affiliated with Wells Fargo. While this theory may ultimately have merit, it is derivative of Wells Fargo's trademark infringement claim. For that reason, the court will focus on Wells Fargo's likelihood of success on the merits of its Lanham Act trademark infringement claim.

Turning to the second Winter factor, the likelihood of irreparable harm in the absence of preliminary relief, Wells Fargo argues that it has "lost scores of customers representing millions of dollars in lost revenue," and "stands to lose even more customers

7

who are confused or are under the wrong impression that defendants are legitimately continuing the original ABD business." Wells Fargo further argues that defendants' actions have caused damage to "Wells Fargo's goodwill and reputation in the ABD brand," and that the loss of ability to control its reputation constitutes irreparable harm.

Wells Fargo then briefly addresses the remaining two Winter factors. As to the balance of hardships, Wells Fargo argues that the irreparable harm that it will suffer from defendants' continued use of the "ABD" name outweighs any impact on defendants. And as to the public interest, Wells Fargo argues that the public is best served by preventing the confusion caused by defendants' use of the "ABD" mark.

In opposing the motion for preliminary injunction, defendants challenge a number of Wells Fargo's arguments, but they focus largely on the argument that Wells Fargo abandoned the "ABD" mark. Defendants argue that Wells Fargo's abandonment undercuts its claim that it has a valid, protectable trademark, and therefore weakens Wells Fargo's argument that it is likely to succeed on the merits of its Lanham Act claim. Again, to establish an abandonment defense, defendants must show that Wells Fargo (1) discontinued use of the mark, and (2) intended not to resume such use. Grocery Outlet, 497 F.3d at 951. Defendants concede that even a single use of the mark can be sufficient to defeat a claim of abandonment, but clarify that such use must be a "bona fide use of a mark in the ordinary course of trade," and not merely token or sporadic usage. 15 U.S.C. § 1127; see also Electro Source, LLC v. Brandess-Kalt-Aetna Group, Inc., 458 F.3d 931, 940 (9th Cir. 2006) ("Because the abandonment inquiry is tied to the unique circumstances of each case, it is appropriate to look at the totality of the circumstances to determine if genuine, albeit limited, usage of the mark qualifies as a trademark use 'in the ordinary course of trade' under § 1127.").

In support of its abandonment argument, defendants rely on the following facts: (1) Wells Fargo formally merged ABD into Wells Fargo Insurance Services as of January 1, 2009, thereby ending the separate existence of ABD; (2) Wells Fargo emails and other internal documents show that it intended to "retire" the ABD name as of January 1, 2009,

8

and Wells Fargo instructed its employees that "the ABD name can no longer be used," that any "stationery, brochures, and other sales materials" bearing the ABD name should be recycled, and that the ABD name should be removed from voicemail messages and email signatures; (3) Wells Fargo did not renew the federal trademark registration for the "ABD" mark; and (4) Wells Fargo did not maintain the "ABD" trade name with the California Department of Insurance, and was therefore prevented from offering insurance services in California under the name "ABD." As explained above, Wells Fargo dismisses the corporate name change as "of no import," and similarly argues that its decision not to renew its federal trademark registration is irrelevant to the issue of whether it has protectable trademark rights. Wells Fargo does not specifically address the decision not to maintain the "ABD" name with the California Department of Insurance, but implies that the decision was merely part of the overall corporate name change, and thus more of a formality than an actual decision to abandon the "ABD" name. The court agrees that, in the context of an abandonment defense, the formalities of trademark registration and maintenance are not as important as the extent of the trademark owner's actual use of the mark. And while defendants are correct that Wells Fargo's internal documents show a clear intent to stop using the "ABD" mark after January 1, 2009, Wells Fargo correctly points out that abandonment requires <u>actual</u> cessation of use. The mere intent to cease use is not enough. <u>Electro Source</u>, 458 F.3d at 937. Thus, the court will focus on Wells Fargo's actual use of the "ABD" mark after January 1, 2009.

 Wells Fargo maintains that, even after January 2009, "the ABD brand did not disappear." Rather, Wells Fargo continued to use the ABD name on "business cards, customer presentations, 'broker of record' letters, payment processing, voicemail messaging systems, and even business faxes." A closer look at the materials cited by Wells Fargo shows the exact extent of this use.

 First, Wells Fargo cites to a number of customer presentations attached to the declaration of Richard Lane. <u>See</u> Lane decl., Exs. C-F. While "ABD Insurance and Financial Services - A Wells Fargo Company" is indeed included as a footer on some these

9

presentations, this footer is also accompanied by ABD's California license number, which - as defendants point out - expired when Wells Fargo chose not to maintain registration of the ABD name with the California Department of Insurance. <u>See</u> <u>id.</u>, Ex. C.  While not necessarily conclusive, the presence of the ABD license number suggests that the presentation footer was a remnant from before 2009, because as defendants pointed out at the hearing, as of January 2009, Wells Fargo no longer had the right to offer insurance services using the expired ABD license number.  In another presentation, ABD is mentioned only as part of customer testimonials. <u>See</u> <u>id.</u>, Ex. D.  Even though the presentation itself is from March 2010, there is no indication as to when the testimonials were given.  ABD is also mentioned in an historical context in a number of other presentations. <u>See</u> <u>id.</u> ("Wells Fargo Insurance Services USA, Inc. (formerly ABD Insurance & Financial Services) is now ranked . . ."); <u>see also</u> <u>id.</u>, Ex. E ("ABD/Wells Fargo appointed broker October 2002"), ("Wells Fargo Insurance Services . . . [acquired] ABD Insurance and Financial Services in 2007"); Ex. F ("Over 50 years ago, Wells Fargo Insurance (formerly ABD Insurance and Financial Services) . . .").

   Second, Wells Fargo submits a business card from one of its managing directors, which includes "Wells Fargo" as the main logo, but also contains a reference to "ABD Insurance and Financial Services" in smaller type, in the lower left-hand corner. <u>See</u> Lane decl., Ex. G.  However, the business card also contains ABD's California Department of Insurance license number, which, as mentioned above, expired as of January 2009.  The declaration accompanying the business card states only that "Wells Fargo employees have used the ABD trademark on business cards even after the name change" and that "[s]ome of these cards are still in use today." <u>Id.</u>, ¶ 14.  In response to defendants' argument that the card contains "an outdated address, phone number and email address," Wells Fargo maintains that "business cards <u>were</u> <u>used</u> after the corporate name change throughout 2009 and 2010," and "are still in use today." <u>See</u> Reply at 3, fn. 1 (emphasis in original).

   Third, Wells Fargo submits correspondence from one of its customers in support of its argument that "certain insurance carrier partners have continued to send business

10

communications directed to ABD, instead of Wells Fargo." See Lane decl., ¶ 16, Ex. H.

Fourth, Wells Fargo submits a number of solicitation emails, sent from its employees to potential customers, mentioning the name "ABD." See Volkel decl., Ex. A. These emails mention ABD in the context of its acquisition by Wells Fargo. See id. ("Our firm, ABD Insurance, was acquired by Wells Fargo 4 years ago.").

Fifth, Wells Fargo submits evidence that it maintains website registrations containing the ABD name, and uses the term "ABD" (and related terms) as keywords in the metatags for the Wells Fargo Insurance Services "Cybersure" website. See McCall decl., Exs. A-B.

Sixth, Wells Fargo submits a number of checks from its customers, made payable to "ABD Insurance" and other variations of the ABD name. See Lane decl., Ex. B. According to the supporting declaration, Wells Fargo has continued accepting these checks into 2012. See id.

Finally, Wells Fargo relies on declarations from several of its employees, attesting to Wells Fargo's use of the ABD name even after 2009. While many of the statements in these declarations are duplicative of the evidence described above, the employees also (identically) state that "[m]any clients and the marketplace continue to associate Wells Fargo's Bay Area insurance brokerage business with the ABD name and the ABD business." See Stahl decl., ¶ 3; Bolger decl., ¶ 2; McDonnell decl., ¶ 2.

To evaluate defendants' abandonment argument, the key question before the court is whether these post-2009 uses of the "ABD" name are enough to constitute "bona fide" use in trade. Here, the court finds the cases cited by the parties to be instructive. Wells Fargo first cites to Electro Source for the proposition that "rid[ding] oneself of inventory" may still constitute bona fide use in the ordinary course of trade. 458 F.3d at 937. However, the court notes that Electro Source did not involve a motion for preliminary injunction, but instead involved review of summary judgment granted in favor of defendant on its abandonment defense. Thus, when the Ninth Circuit was analyzing the issue of abandonment, it was viewing the facts in a light most favorable to plaintiff, who needed only to show a triable issue of fact with respect to abandonment. For that reason, Electro

1  Source is of limited value to this case, where Wells Fargo is asking for the extraordinary
2  relief of a preliminary injunction, and bears the burden of showing that it is likely to succeed
3  on the merits of its trademark infringement claim (which necessarily includes a showing that
4  defendants are not likely to succeed on their abandonment defense).

5        Wells Fargo also cites to the district court's opinion in Grocery Outlet to show that a
6  "sell off of residual inventory" can constitute bona fide commercial use. 2008 WL 5245962,
7  at *8 (N.D. Cal. Dec. 17, 2008). In Grocery Outlet, the district court granted summary
8  judgment in favor of the trademark holder, finding that it had not abandoned its mark.
9  However, the Grocery Outlet trademark holder had not only renewed the trademark that the
10 alleged infringer argued was abandoned, but had also made plans to start using the mark
11 again. 2008 WL 5245962, at *9 (finding "sufficient, undisputed, and contemporaneous
12 evidence indicating that Albertsons intended to resume use of the name prior to the last
13 bona fide commercial uses in 2005").

14       Finally, Wells Fargo cites to a case from the Eastern District of Ohio, where the
15 parties cross-moved for summary judgment, and where the court granted summary
16 judgment in favor of plaintiff on the issue of abandonment. KeyCorp v. Key Bank & Trust,
17 99 F.Supp.2d 814, 826-27 (E.D. Ohio 2000). However, in KeyCorp, the defendant
18 conceded that the use of the mark had not yet been discontinued, and instead based its
19 entire abandonment argument on plaintiff's prospective intent to stop using the mark. Id. at
20 827. Here, defendants argue that Wells Fargo's post-2009 uses of the "ABD" mark were
21 not bona fide uses, thus distinguishing this case from KeyCorp.

22       Defendants cite to a number of cases in support of their abandonment argument,
23 some involving fairly extensive use of a mark after the purported abandonment, some
24 involving fairly limited examples of such use. For example, in Metropolitan Life Ins. Co. v.
25 O'M & Assoc. LLC, the plaintiff pointed to a single internal fax with the trademarked name
26 in the header as evidence that it had not abandoned its mark. 2009 WL 3015210, at *4
27 (N.D. Ill. Sept. 16, 2009). The court rejected that argument, found that the use was "at best
28 token or residual use of the mark" and "not sufficient to constitute bona fide use of the

12

1  mark." Id. (granting summary judgment in favor of defendants).  In another case cited by
2  defendants, the trademark holder argued that it had not abandoned its mark by pointing to
3  four of its company vans that still bore the old mark and a phone book listing that did the
4  same. Newsouth Comm. Corp. v. Universal Telephone Co., 2002 WL 31246558, at *14
5  (E.D. La. Oct. 4, 2002).  However, after determining that the phone book listing was the
6  result of a "screw up," and that the vans' logo was the result of a similar mistake, the court
7  found that the plaintiff had indeed abandoned its mark, and denied injunctive relief. Id. at
8  14-15.  Neither of these cases are applicable to the present case, as Wells Fargo's use of
9  the "ABD" mark goes beyond the uses in Metropolitan Life and Newsouth.

10       Of the cases cited by defendants, the closest to the present case is Cascade
11 Financial Corp. v. Issaquah Community Bank. 2007 WL 2871981 (W.D. Wash. Sept. 27,
12 2007).  In that case, plaintiff Cascade Bank acquired "Issaquah Bank" in 2005, and made
13 efforts to rebrand the former "Issaquah" services as "Cascade." Id. at *4.  It changed all
14 Issaquah signage, stationery, advertising materials, and deposit slips to "Cascade." Id.
15 When defendant Issaquah Community Bank opened for business in 2007, plaintiff Cascade
16 Bank filed suit and moved for a preliminary injunction.  Defendant argued that Cascade had
17 abandoned the "Issaquah" mark, pointing to the rebranding efforts described above.  In an
18 attempt to show that it had not abandoned the "Issaquah" mark, plaintiff argued that it
19 "continued to process Issaquah Bank deposit and withdrawal slips and checks," that it
20 continued to use the Issaquah Bank domain names, and that it still advertised its services
21 using the "Issaquah" name. Id. at *5-6.  After discussing the relevant legal standard set
22 forth by Electro Source and other cases, the Cascade court ultimately found that
23 "[d]efendants have demonstrated a likelihood of success on their affirmative defense of
24 abandonment, thus precluding a finding for plaintiffs at this time of a likelihood of success
25 on the merits" of their Lanham Act claim. Id. at *10 (denying motion for preliminary
26 injunction).  Importantly, while the court recognized that Cascade "continue[d] to process
27 old deposit and withdrawal slips featuring the Issaquah Bank name," it also found that
28 Cascade had "taken affirmative steps to encourage its customers to stop using the

13

Issaquah Bank name." Id. (emphasis in original).

On the issue of abandonment, the court finds that this case is closer to Cascade than it is to any of the cases cited by Wells Fargo. As an initial matter, unlike the cases cited by Wells Fargo, Cascade analyzed the abandonment defense as part of a motion for preliminary injunction. But more importantly, the court finds striking similarities between Cascade's efforts to rebrand its newly-acquired Issaquah Bank services and Wells Fargo's efforts to rebrand its newly-acquired ABD services. Like Wells Fargo, Cascade did not maintain the corporate status of the company that it acquired, instead choosing to operate its business under one name. See Cascade at *6. Like Wells Fargo, Cascade maintained the domain names of its acquired company, but redirected website traffic to its own website. Id. at *5. And like Wells Fargo, Cascade continued to accept documents bearing the acquired company's name from its customers. Id. at *10. In short, to the extent that Wells Fargo continued to use the ABD name after 2009, such uses were either residual (such as the business cards and presentations, both of which also listed ABD's expired license number) or in the context of a historical background (such as the presentations mentioning that ABD was one of Wells Fargo's acquisitions over the years). Such uses are not in the "ordinary course of trade" as required by section 1127 and by Electro Source. Thus, while the court does not rule on the ultimate issue of whether Wells Fargo actually abandoned the "ABD" mark, it does find that defendants have made a sufficient showing of a likelihood of success on the merits of their abandonment defense to preclude a finding that Wells Fargo is likely to succeed on its Lanham Act claim.

Even leaving aside the abandonment issue, there are other obstacles to Wells Fargo's showing of likelihood of success on the merits of its Lanham Act claim. As set forth above, Wells Fargo must show that (1) it owns a valid trademark and (2) defendants' use of the mark is likely to cause consumer confusion. Applied Information, 511 F.3d at 969. In evaluating the likelihood of consumer confusion, courts look to the eight Sleekcraft factors. The parties' briefs show that their disputes are largely limited to three of the Sleekcraft factors; namely, the evidence of actual confusion (factor 4), the type of goods and the

14

degree of care likely to be exercised by the purchaser (factor 6), and defendants' intent in selecting the mark (factor 7).

As to the evidence of actual confusion, Wells Fargo first cites to customer emails asking about the link between Wells Fargo and the new ABD company. See Boyd decl., Exs. EE, HH, II, JJ. However, all of these emails are from July 2012, immediately after the launch of the ABD website on July 19-20, 2012. Wells Fargo also cites to confusion regarding a broker of record letter, but this confusion also occurred in the weeks immediately after ABD's launch. See Volkel decl., Ex. B. In its reply brief, Wells Fargo maintains that "actual confusion continues today." In support of this argument, it cites to an email regarding a document subpoena that was served on ABD Insurance and Financial Services, Inc. See second Boyd decl., Dkt. 78-1, Ex. A. In response to the subpoena, ABD returned a Certificate of No Records, and explained that it "picked up the [ABD] name but that Wells Fargo had the records." Id. In spite of Wells Fargo's arguments to the contrary, this email does not show the type of consumer confusion typically considered under the Sleekcraft factors. Instead, it appears to be a mistake about the possession of certain corporate records. The subpoena sought documents relating to a coverage dispute from sometime in 2008 or 2009. Id. The subpoena was sent to the new ABD company, but because ABD was not yet in business at the time of the coverage dispute, it pointed the subpoena-issuer to Wells Fargo, who would have had records from that time period. Id. While this may be some evidence of confusion, it is certainly not evidence of consumer confusion. Thus, outside of the period immediately following ABD's launch, Wells Fargo has failed to show any examples of confusion among the consumers of the insurance products both companies provide.

The lack of evidence of actual confusion is relevant to the court's consideration of the sixth Sleekcraft factor, the type of goods and the degree of care likely to be exercised by the purchaser. Defendants argues that their (and Wells Fargo's) business is "a relationship driven business in which clients make decisions based upon existing long-standing relationships." Defendants also cite to declarations from two of their customers,

15

each stating that they chose to do business with ABD based on their relationships with certain brokers who left Wells Fargo to join ABD, and that they were "at no point" confused by the ABD name. See Sawyers decl., ¶¶ 4-5; Morris decl., ¶¶ 3-4. The Morris declaration further states that Wells Fargo contacted him in an effort to retain his company's business, but that he "informed [Wells Fargo] that due to [his] long-standing and close relationship" with an ABD broker, he had chosen to move his account to ABD. Morris decl., ¶ 5. Wells Fargo argues only that the degree of consumer care "cannot be measured in a vacuum," and that the evidence of actual confusion shows that the customers are not actually as sophisticated as defendants contend. Mot. at 18; Reply at 11.

The court finds defendants' arguments far more convincing here. Insurance brokerage is not an industry where customers make purchases on a whim, and can be easily fooled by the name of a company. Instead, as defendants point out, several clients requested pitches from both Wells Fargo and ABD before deciding which company would receive their business. See Hetherington decl., ¶ 31. Perhaps the most striking example of customer sophistication comes from an unsolicited email sent from a customer to one of the employees who left Wells Fargo to join ABD. See McCall decl., Ex. A. This customer learned that Mr. McCall had left Wells Fargo, and sent an email to his personal email address, expressing a desire to "explore what to do and determine what's in the best interest of our plans." Id. The customer noted that "Wells Fargo is anxious to keep our business," but made clear that he "value[d]" Mr. McCall and another ABD employee "much more as individuals than as Wells Fargo employees." Id. Wells Fargo may be correct that it has "lost scores of customers representing millions of dollars in lost revenue" as a result of defendants' actions. However, Wells Fargo has not shown that it has lost business as the result of defendants' alleged trademark infringement. Instead, it seems equally (if not more) likely that Wells Fargo's lost business was the result of each customer's informed choice about whether to do business with Wells Fargo or ABD.

Turning to defendants' intent in choosing the "ABD" mark, it does seem clear that defendants chose the mark to signal some sort of link with the original ABD company, and

16

not merely as a way to "honor their fathers and their legacies." The seventh Sleekcraft factor weighs decisively in favor of Wells Fargo. However, Wells Fargo attempts to place far too much emphasis on this factor. Its motion is riddled with references to defendants' allegedly bad conduct in leaving Wells Fargo and starting their own business. Specifically, Wells Fargo blames defendants for "orchestrat[ing] a mass walk-out of over 60 Wells Fargo employees," and "direct[ing] Wells Fargo staff to burn CDs with confidential client information." Mot. at 1, 7. Wells Fargo continues this theme in its reply brief, emphasizing that ABD "rushed to burn the CDs immediately before departing Wells Fargo for a competing business when they knew full well that Wells Fargo's remaining employees could have provided clients this same information." Reply at 11 (emphasis in original). While this alleged behavior certainly would explain the discord between the parties, these allegations are far more relevant to Wells Fargo's concurrent state court suit for breach of the duty of loyalty, intentional interference with economic relationships, intentional interference with potential economic relationships, unfair competition, conspiracy, and breach of contract. In this case, these facts are relevant only to the extent that they provide insight as to defendants' intent in selecting the "ABD" mark. The court agrees that Wells Fargo has the better of that argument. However, because Wells Fargo has not shown any examples of consumer confusion after August 2009, and because its customers are likely to exercise a high degree of care, the Sleekcraft factors do not decisively weigh in Wells Fargo's favor.

       The dispute over consumer confusion and degree of care is also directly relevant to the second prong of the Winter test, the likelihood of irreparable harm. As explained above, Wells Fargo has not provided a single instance of a customer who chose to do business with ABD (rather than Wells Fargo) because of ABD's alleged trademark infringement. Instead, Wells Fargo has shown only that some customers moved their business from Wells Fargo to ABD. In other words, Wells Fargo has not established a nexus between defendants' alleged infringement and any harm suffered by Wells Fargo. Thus, in the absence of any harm already suffered, Wells Fargo cannot show that it is likely

to suffer continued irreparable harm without a preliminary injunction. The fact that all cited examples of consumer confusion occurred in the weeks immediately following ABD's launch further supports a finding of no irreparable harm. To the extent that Wells Fargo was harmed by any confusion that occurred in those weeks, such harm can be remedied by monetary damages.

The remaining two Winter factors do not significantly affect the court's analysis. On the balance of hardships prong, it is true that Wells Fargo is somewhat burdened by defendants' use of the "ABD" name, but it is also true that defendants would suffer hardship if it were forced to rename and rebrand its entire company. As to the public interest prong, the public's main interest here is ensuring that preliminary injunctions are issued only in appropriate cases, and based on the court's analysis of the first two Winter prongs, this does not appear to be such a case.

Accordingly, plaintiff's motion for preliminary injunction is DENIED.

**IT IS SO ORDERED.**

Dated: March 8, 2013

PHYLLIS J. HAMILTON
United States District Judge