KEVIN D. RISING (SBN 211663)
Kevin.Rising@btlaw.com
DEVIN STONE (SBN 260326)
Devin.Stone@btlaw.com
**BARNES & THORNBURG LLP**
2029 Century Park East, Suite 300
Los Angeles, CA 90067
Telephone:  310-284-3880
Facsimile:  310-284-3894

FELICIA J. BOYD (*Admitted Pro Hac Vice*)
felicia.Boyd@btlaw.com
AARON A. MYERS (*Admitted Pro Hac Vice*)
aaron.myers@btlaw.com
**BARNES & THORNBURG LLP**
225 South Sixth Street, Suite 2800
Minneapolis, MN 55402
Telephone:  (612) 333-2111
Facsimile:  (612) 333-6798

Attorneys for Plaintiffs
WELLS FARGO & COMPANY and
WELLS FARGO INSURANCE SERVICES USA, INC.

**REDACTED COPY**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA - OAKLAND DIVISION

| | |
|---|---|
| WELLS FARGO & COMPANY and WELLS FARGO INSURANCE SERVICES USA, INC.<br><br>Plaintiffs,<br><br>v.<br><br>ABD INSURANCE & FINANCIAL SERVICES, INC. (f/k/a INSURANCE LEADERSHIP NETWORK, INC.), d/b/a "THE ABD TEAM"; KURT DE GROSZ; and BRIAN HETHERINGTON,<br><br>Defendants. | Case No.: 4:12-cv-03856-PJH<br><br>**WELLS FARGO'S RENEWED MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:   August 6, 2014<br>Time:   9:00 a.m.<br>Courtroom 3, Third Floor<br>The Hon. Phyllis J. Hamilton |

## NOTICE OF MOTION AND RENEWED MOTION

PLEASE TAKE NOTICE that on August 6, 2014, at 9:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 3, Third Floor, of the above-captioned Court, located at 1301 Clay Street, Oakland, 94612, Plaintiffs Wells Fargo & Company and Wells Fargo Insurance Services USA, Inc., (collectively, "Wells Fargo") will move this Court for a preliminary injunction immediately restraining defendants ABD Insurance & Financial Services et al. (collectively, "Defendants") from any and all use of the "ABD" brand owned by Wells Fargo as set forth in the simultaneously filed proposed order. The motion is based on this notice and supporting memorandum of points and authorities, the Ninth Circuit Court of Appeals' decision in this case, the accompanying declarations with exhibits; all pleadings and papers on file in this action; and such other and further matters as the Court may consider.

Dated: June 12, 2014

**BARNES & THORNBURG LLP**

By: _s/Felicia Boyd_
Attorneys for Plaintiffs WELLS FARGO & COMPANY and WELLS FARGO INSURANCE SERVICES USA, INC.

# TABLE OF CONTENTS

Page Number

I.    INTRODUCTION ...................................................................................1

II.   STATEMENT OF FACTS .......................................................................3

    A.    In 2007 Wells Fargo Purchased ABD, a Nationally Acclaimed Insurance Brokerage Company Based in the Bay Area...............................................3

    B.    Wells Fargo Continues to Use the ABD Brand to Attract and Maintain Customers ..............................................................................................4

    C.    In 2009, Defendants Form a New Brokerage Company and Make Plans to Appropriate the ABD Name and Goodwill Belonging to Wells Fargo.................8

    D.    Wells Fargo Learns of Defendants' Plan and Takes Action to Prevent Defendants from Illegally Using the ABD Mark But Defendants Appropriate and Exploit the ABD Brand and Associated Goodwill Anyway. ........................................9

    E.    The "Relaunch" of ABD Fosters Confusion in the Marketplace and Bewilders Upstream and Downstream Customers Alike. ..........................................11

    F.    Wells Fargo Continues to Suffer Irreparable Harm. ...............................14

    G.    The Ninth Circuit Court of Appeals Concludes that Wells Fargo did not Abandon the ABD Trademark and Reverses the Order Denying Wells Fargo Injunctive Relief ...................................................................................................15

III.  ARGUMENT ......................................................................................16

    A.    Wells Fargo is Likely to Succeed on the Merits of One or More of its Claims.....16

        1.    Wells Fargo is likely to succeed on its claim for trademark infringement.16

        2.    Wells Fargo is likely to succeed on its false affiliation claim....................20

        3.    Wells Fargo is likely to succeed on its false advertising claim.................21

    B.    Injunctive Relief Is Needed to Prevent Ongoing Irreparable Harm to Wells Fargo. ...................................................................................................22

    C.    The Balance of Hardships Favors Wells Fargo.....................................23

    D.    The Public Interest Favors Injunctive Relief. ......................................24

IV.   CONCLUSION....................................................................................24

# TABLE OF AUTHORITIES

## FEDERAL CASES

*AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir.1979) ...............................................17, 18, 20

*Abdul-Jabbar  v. General Motors Corp.*, 85 F.3d 407 (9th Cir. 1996).................................20, 21

*Applied Information Scis. Corp. v. eBAY, Inc.*, 511 F.3d 966 (9th Cir. 2007) .............................17

*Brookfield Commc'ns, Inc. v. W. Coast Entertainment Corp.*, 174 F.3d 1036 (9th Cir. 1999) .....20

*Cairns v. Franklin Mint*, 292 F.3d 1139 (9th Cir. 2002) ............................................................20

*Electropix, Inc. v. Liberty Livewire Corp.*, 178 F. Supp. 2d 1125 (C.D. Cal. 2001) ....................19

*Elvis Presley Enterprises, Inc. v.  Capece*, 141 F.3d 188 (5th Cir. 1998) ....................................19

*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837 (9th Cir. 1987) ...............................19

*Herb Reed Enterprises, LLC v. Florida Entertainment Management, Inc.*, 736 F.3d 1239 (9th Cir. 2013) .......................................................................................................2, 3, 16, 22

*Jack Russell Terrier Network of N. Ca. v. America Kennel Club, Inc.*, 407 F.3d 1027 (9th Cir. 2005) ...................................................................................................................20

*Mattel, Inc. v. Walking Mountain Products*, 353 F.3d 792 (9th Cir. 2003)..................................20

*Moroccanoil, Inc. v. Moroccan Gold, LLC*, 590 F. Supp. 2d 1271 (C.D. Cal. 2008) ..................24

*Mortgage Electric Registration System v. Brosnan*, No. C09-3600, 2009 U.S. Dist. LEXIS 87596 (N.D. Cal. Sept. 4, 2009) ...............................................................................23

*Network Automation, Inc. v. Advanced System Concepts, Inc.*, 638 F.3d 1137 (9th Cir. 2011)17, 18

*Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002 (9th Cir. 2004) .............................19

*Opticians Association of America v. Independent Opticians of America*, 920 F.2d 187 (3d Cir. 1990) ...................................................................................................................24

*Playboy Enterprises, Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020 (9th Cir. 2004) ............19

*Power Balance LLC v. Power Force LLC*, 2010 WL 5174957 (C.D. Cal. 2010) ........................17

*Rearden LLC*, 683 F.3d at 1210.................................................................................................19

*Rent-a-Center, Inc. v. Canyon Television & Appliance*, 944 F.2d 597 (9th Cir. 1991) ...............23

*Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105 (9th Cir. 2012) ............................................22

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134 (9th Cir. 1997)....................................21

*Stuhlbarg*, 240 F.3d at 841.............................................................................................................23

*Summit Technology, Inc. v. High-Line Medical Instruments, Co.*,
933 F. Supp. 918 (C.D. Cal. 1996) ...............................................................................................21

*SunEarth Inc.*, 846 F. Supp. 2d at 1084 ........................................................................................24

*Thane Intern., Inc. v. Trek Bicycle Corp.*, 305 F.3d 894 (9th Cir. 2002) ....................................19

*TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820 (9th Cir. 2011).........................................22

*Waits v. Frito Lay*, 978 F.2d 1093 (9th Cir. 1992) ........................................................................21

*Wells Fargo & Co. v. ABD Insurance & Finance Services, In.*
 (9th Cir. Mar. 3, 2014)...................................................................................2, 10, 15, 17, 19

*Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008).................................................3

# FEDERAL STATUTES

15 U.S.C. § 1125(a)(1)....................................................................................................................17

15 U.S.C. § 1125(a)(1)(A) ..............................................................................................................20

15 U.S.C. § 1125(a)(1)(b) (2008) ...................................................................................................21

15 U.S.C. § 1125(a)(1)(B) ..............................................................................................................21

## MEMORANDUM IN SUPPORT OF MOTION

## I.     INTRODUCTION

Wells Fargo renews its motion for preliminary injunctive relief to stop Defendants' willful infringement of Wells Fargo's "ABD" trademark as well Defendants' continued efforts to falsely hold themselves out as the ABD Insurance and Financial Services, Inc. insurance brokerage firm that Wells Fargo has owned for the past seven years.   Undeterred by the Ninth Circuit Court of Appeals rejection of Defendants' argument that Wells Fargo had abandoned the ABD trademark despite ongoing use of the mark, Defendants continue to use Wells Fargo's ABD trademark and to hold themselves out as something they are not.

Since their exodus in 2012, Defendants have exploited the ABD mark, name and history to compete unfairly against Wells Fargo, creating the false notion that Defendants either are, or are affiliated with, the entity that Wells Fargo purchased in 2007.  But Defendants are not ABD.  They are only a small group of former ABD employees.  The majority (literally hundreds) of the real legacy ABD employees remain at Wells Fargo and are left to deal with the confusion created by Defendants' false and misleading statements.  The result of Defendants' efforts is not surprising:  Defendants wholly appropriated an identity to which they have no right, avoiding the time and expense necessary for a start-up company to build a reputation, and proceeded to build a profitable brokerage business based on that false identity.  This was the plan from the beginning.  Defendants chose to take the ABD mark and identity because ABD  is well-known and possesses a "ton of brand equity" that Defendants could leverage as an immediate business advantage in the highly competitive brokerage marketplace. Using that same "brand equity," Defendants were able to secure substantial funding from banks and various investors.

The ABD trademark, history, and associated goodwill that Wells Fargo purchased in 2007 belong exclusively to Wells Fargo.  The harm stemming from Defendants' conduct is irreparable. With their brazen taking of Wells Fargo's ABD trademark and history, Defendants have seriously diminished the source-identifying function of the trademark, impaired the goodwill associated with the trademark, and deprived Wells Fargo of the ability to control the business reputation and quality of the services offered under the trademark.  For far too long now, Defendants have gotten away with pretending to be something they are not.  Defendants cannot complain about relinquishing goodwill

that was never theirs to use in the first place

This Court denied Wells Fargo's first motion for injunctive relief based on its acceptance of Defendants' erroneous abandonment and trademark confusion arguments. The Ninth Circuit reversed this Court's decision and remanded the case with instructions to reconsider Wells Fargo's injunction request. *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, __ F.3d __, 13-15625, 2014 WL 806385 (9th Cir. Mar. 3, 2014), as amended (Mar. 11, 2014).

**First**, the Court of Appeals instructed this Court to look again at the merits of Wells Fargo's trademark claims in light of (1) its determination that Wells Fargo did not abandon the ABD mark and had continued to use the mark "in the ordinary course of business," as it does to this day; and (2) its holding that evidence of actual confusion has "diminished importance" at the preliminary injunction stage, and should not be overemphasized in reviewing the question of likelihood of confusion. *Wells Fargo*, __ F.3d __, 2014 WL 806385 at *3.

**Next**, the Court held that Wells Fargo was entitled to consideration of its injunction request based on its claims for false affiliation and false advertising, neither of which rests on ownership of any trademark. *Id.*

**Finally**, the Court instructed the parties and this Court to evaluate harm to Wells Fargo based on its recent decision in *Herb Reed Enterprises, LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1247 (9th Cir. 2013), in which the case the Ninth Circuit emphasized that a trademark holder could demonstrate irreparable harm in the form of diminished goodwill and the loss of control of business reputation caused by another's trademark infringement. *Id.*

As made clear by the Ninth Circuit's holding and as demonstrated by evidence (which includes dozens of recently discovered or produced documents), Wells Fargo is entitled to an immediate preliminary injunction because (1) it is likely to succeed on the merits of one or more of its claims, (2) it has suffered and is suffering irreparable harm that will continue in the absence of injunctive relief, (3) the harm to Wells Fargo in the absence of injunctive relief far outweighs the minimal harm to Defendants if relief is granted, and (4) the public interest favors an injunction. *Herb Reed*, 736 F.3d at 1247 (citing *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008)).

## II.   STATEMENT OF FACTS

**A.    In 2007 Wells Fargo Purchased ABD, a Nationally Acclaimed Insurance Brokerage Company Based in the Bay Area.**

In 2007, Wells Fargo acquired the assets of ABD Insurance and Financial Services, Inc. ("ABD"), an insurance brokerage company founded in 1990 by Doug Alburger, Bruce Basso, and Frederick de Grosz, and named using the first initials of the three founders' surnames. [Concurrently filed Declaration of Felicia Boyd ("Boyd Decl.") Exs. A and P.] ABD was a highly successful brokerage company. In 2006, it was the 15th largest insurance brokerage firm in the nation according to Business Insurance magazine, and the second largest in the Bay Area according to the San Francisco Business Times. [Boyd Decl., Exs. B and C; Declaration of Krista Holt ("Holt Decl.") ¶¶ 27-29]

Wells Fargo purchased the ABD brokerage and all of its assets including its name, intellectual property, and goodwill, as part of the acquisition of Greater Bay Bancorp, for which it paid $1.5 billion. [Boyd Decl., Exs. D, E, F, G; Lane Decl., ¶ 2] The goodwill alone was valued at nearly $270 million. [Lane Decl., ¶ 2, Ex. A]. Greater Bay's ownership of ABD was one of the primary reasons that Wells Fargo acquired it. [Zuercher Decl. ¶ 2] Through the acquisition, Wells Fargo Insurance Services strengthened its foothold in California in general, and the San Francisco Bay Area, specifically. [*Id.*] Moreover, Wells Fargo did not have the brand recognition in California and the Bay Area that ABD enjoyed. [Zuercher Decl. ¶ 3] Wells Fargo used the ABD mark to strengthen its brand recognition in the area. [*Id.*] Wells Fargo also used its larger size to increase its bargaining power. [Zuercher Decl. ¶ 4] With the acquisition, hundreds of ABD employees joined the Wells Fargo insurance brokerage team, including two of ABD's founders, de Grosz and Basso. [Boyd Decl., Exs. E, F, H]

What Wells Fargo acquired for its considerable investment was ABD's visibility and business reputation, which were of vital importance to Wells Fargo. A brokerage company's reputation and client relationships are of great importance in the insurance brokerage industry, where competition is intense and where potential clients look to a brokerage's visibility and reputation to signal that a brokerage will be able to meet expectations. As service capabilities and integrity are nearly impossible to ascertain beforehand, would-be clients look to a brokerage's reputation to signal that a brokerage

firm will be more likely to meet expectations.  Well-established brands are critical to brokerage firms because of their ability to perform this signaling function.  [Holt Decl. ¶¶ 14-17; *see also* concurrently filed Declaration of David Zuercher ("Zuercher Decl.")]¶ 3]

It was exactly this reputation and expertise that Wells Fargo purchased with its acquisition of ABD.  For example, formal client research surveys ABD conducted established high praise from human resources and finance professionals alike.  [Boyd Decl., Ex. KKK ("ABD's service and support function is an invaluable asset to our organization and unmatched in our industry.") and JJJ ("ABD is a great resource for exploring offbeat scenarios that employees bring to us that we don't know how to address or even where to start.  We do not have the resources in-house that ABD brings to the table.")]  "ABD" is a strong, valuable mark in the insurance service industry because of ABD's track-record of business integrity and quality service.  [Holt Decl. ¶¶ 26-29].  The acquisition worked to bolster Wells Fargo's reputation and reach in the Western United States, and in particular, the San Francisco Bay area.  [Zuercher Decl. ¶¶ 2-3]

**B.      Wells Fargo Continues to Use the ABD Brand to Attract and Maintain Customers**

Following the acquisition in 2007, Wells Fargo continued to operate the ABD business as ABD Insurance and Financial Services, Inc., along with the ABD mark and logo, while Wells Fargo worked to integrate the ABD business team and systems into the Wells Fargo Insurance Services systems.  During this period, the ABD legal name and trademark were used on both a standalone basis and in combination with the famous Wells Fargo brand, giving Wells Fargo the ability to leverage the ABD brand and history it had acquired.  [Boyd Decl., Ex. E.; Zuercher Decl. ¶¶ 2-7]

In 2009, Wells Fargo merged the ABD corporate entity with "Wells Fargo Insurance Services USA, Inc." as part of the integration process to a single corporate brokerage.  The result was a single corporate entity under the Wells Fargo Insurance Services USA legal name.  The ABD legal name, after the merger, no longer existed.  However, Wells Fargo also decided that it would continue to use the ABD mark and business name going forward in a selective way to highlight the ABD brand "in Bay Area Marketing campaigns and sale situations when appropriate."  [Boyd Decl., Ex. PP.]  This use was consistent with Wells Fargo's prior brokerage acquisitions.  [Zuercher Decl. ¶ 5]  The ABD name would be particularly important for customers and potential customers who were adverse to engaging

the services of a brokerage with competing banking services *e.g.,* competing financial institutions and credit unions.  [Zuercher Decl. ¶ 6, Ex. B]

Consistent with this strategy, Wells Fargo used the ABD name and brand equity in the ordinary course of business including select customer presentations; in payment processing and correspondence; on business cards and letterhead; on voicemail messaging systems; on broker of record letters; on outgoing business faxes; and on Wells Fargo's website.  [Boyd Decl., Ex. I, N; Lane Decl., ¶¶ 7-16 and Exs. C-G; concurrently filed Declaration of Robert Volkel ("Volkel Decl."), ¶¶ 4-13 and Ex. A; Dkt. 64 (Bingham Decl.), ¶ 2; Dkt. 65 (Bolger Decl.), ¶ 3; Dkt. 70 (Stahl Decl.), ¶¶ 3-5.; Concurrently filed Declaration of Brian McDonnell ("McDonnell Decl.") ¶¶ 3-5; Zuercher ¶ 5]  Indeed, in one recent request for proposal, a client asked Wells Fargo to "Provide a brief overview of your firm [including] your firm's presence in the Central Coast and Bay Area markets. . ."  [McDonnell Decl. Ex. C]  On June 4, 2013, Wells Fargo responded with its <u>standard pitch</u>: "Wells Fargo Insurance acquired ABD Insurance & Financial Services in 2007; ABD was headquartered in Redwood City, Calif."  [*Id.*] Wells Fargo also utilizes its prior Acordia acquisition in conjunction with ABD to capitalize on its footprint in the Bay Area.  [*Id.*]

Wells Fargo continues to use the ABD mark on its website and transformed the <u>abdi.com</u> domain to re-direct internet traffic to the Wells Fargo website.  [McCully Decl., ¶¶ 2-7 and Exs. A-B; Lane Decl., ¶¶ 11-13; Volkel Decl., ¶¶ 8-9; McDonnell Decl. ¶¶ 3-5; Dkt. 70 (Stahl Decl.), ¶¶ 3-5.] Web traffic to the abdi.com website is significant; <u>over 20,000 people per year visit abdi.com and are redirected to Wells Fargo's website</u>.  [McCully Decl. ¶ 5.]  Wells Fargo also uses "ABD Insurance and Financial Services" as a metatag to closely associate Wells Fargo's website with search results for "ABD Insurance and Financial Services."  As a result, a search for "ABD Insurance and Financial Services" will display the Wells Fargo Insurance Services website at or near the top of the results list. [McCully Decl., ¶ 6 and Ex. B.].  *Wells Fargo*, __ F.3d at __, 2014 WL ____ at *2.   Wells Fargo's use

of its ABD trademark continues to this day.[1]

Another example of Wells Fargo's brand leverage strategy is found in its relationship with the Associated Roofing Contractors of the Bay Area Counties ("the Roofing Association").[2]  Since 2007, Wells Fargo has paid to be an Associate member and used the internet marketplace provided by the Roofing Association to promote its insurance brokerage services simultaneously under the ABD and Wells Fargo brands.  One screenshot tells the story:

_____

[1] The Ninth Circuit Court of Appeals examined the various forms of ongoing use in the record and concluded that Wells Fargo had demonstrated that these uses were *bona fide* uses for purposes of concluding that Wells Fargo had not abandoned the ABD trademark as a matter of law.  Defendants' Petition for Rehearing asked the Ninth Circuit to reconsider this portion of its ruling.  The Ninth Circuit declined.

[2] The Roofing Association is one of the oldest construction industry trade associations in California.  The Roofing Association acts as the collective bargaining agent for unionized roofing contractors.  Associate membership is open to manufacturers and suppliers of materials and equipment used in the roofing industry, as well as providers of business and professional services to roofing contractors.  Associate members are given the ability to promote their goods and services to both union members and other Associate members in exchange for a substantial sponsorship fee.  Thus, Manufacturing Supply Members promote their roofing and building products alongside Service Members promoting banking, insurance and other services.



ASSOCIATE MEMBERS




Wells Fargo Insurance Services

Wells Fargo Insurance Services

**ABD Insurance and Financial Services** is a major regional insurance brokerage, employee benefits and risk management consulting firm and a proud member of the **Wells Fargo** family of companies.  With seventeen (17) offices in California, Nevada, Oregon and Washington, ABD was recently ranked as the 14th largest U.S. retail broker and the nation's number one Directors' and Officers' Liability (D&O) broker

ABD provides a unique combination of client services, strategic global market relationships, specialized industry knowledge, and focus on results. Despite dramatic growth into a full service, global broker, ABD has retained the best characteristics of our regional past - including direct access to top management, a flat, responsive organizational structure, personal accountability at all levels, and a business anchored in long-standing relationships with customers, vendors, and insurance carriers.

ABD's capabilities include: Property & Liability Programs; Workers' Compensation; Personal Insurance Programs; Retirement Plan Services; Enterprise Risk Management Services; Risk Control and Claims Consulting; Directors and Officers Liability; Association Programs; International Risk and Benefits Consulting; and Employee & Executive Benefit Consulting.

Location:

959 Skyway Road, Suite 200, San Carlos, CA  94070
Telephone: (650) 839-6224     FAX: (650) 839-6050

Web: www.cybersure.com/cybersure/default.aspx

[McDonnell Decl.¶ 7, Ex. A].  Wells Fargo has also paid to list its website under the name "ABD Insurance and Financial Services" on the American Subcontractors Association of California. [McDonnell Decl. ¶ 8, Ex. B].  Such relationships are not surprising; Wells Fargo employees routinely introduce themselves to potential customers as members of 'Wells Fargo, formerly ABD,' or some variation thereof.  [McDonnell Decl. ¶ 4; Zuercher Decl. ¶ 5; Volkel Decl. ¶ 17.]

Thus, Wells Fargo has continuously and prominently used the ABD name and brand since acquiring the brokerage as it deemed appropriate.  In addition, many of the Wells Fargo employees who left Wells Fargo to join Defendants were instrumental in continuing to use the ABD brand and to

WELLS FARGO'S RENEWED MOTION FOR PRELIMINARY INJUNCTION

tie it tightly to Wells Fargo.  [Volkel Decl., ¶ 4 and Ex. A; Dkt. 70 (Stahl Decl.), ¶ 4; Dkt. 65 (Bolger Decl.), ¶ 3.]

### C. In 2009, Defendants Form a New Brokerage Company and Make Plans to Appropriate the ABD Name and Goodwill Belonging to Wells Fargo

In 2009, former ABD founders Basso and de Grosz left Wells Fargo.  De Grosz helped his son (defendant Kurt de Grosz) establish a new insurance and financial services company called Insurance Leadership Network, Inc. ("ILN"), which de Grosz senior viewed as a "shell company" that would "prepare[ ] the groundwork for the *reborn ABD*." [Boyd Decl., Ex. J (emphasis added).]

In October 2011, defendant Kurt de Grosz proceeded to file a federal trademark application for the ABD mark for use by ILN.  [Boyd Decl., Ex. M]  In May 2012, Kurt de Grosz applied to register the d/b/a for ABD Insurance and Financial Services for ILN with the California Department of Insurance. [Boyd Decl., Ex. L]  After the Department of Insurance refused to permit the d/b/a, Kurt de Grosz provided a "release of the ABD" name from his father, Fred de Grosz (who did not have any ownership interest in the name), and re-submitted the application without disclosing Wells Fargo's rights to the ABD mark and brand.  *Id*.  The name change was subsequently granted.  *Id*.  However, the Department of Insurance testified that if Fred De Grosz had stated in his letter that he had sold his interest in ABD to Wells Fargo, they would not have issued the d/b/a without contacting Wells Fargo. [Boyd Decl. Ex. WW (Bankston Depo., p. 27).]  Significantly, Brian Hetherington testified that the value of ABD was, in part, grounded in the fact that the Department of Insurance had already accepted the name.  [Boyd Decl. Ex. LLL (Deposition of Brian Hetherington 157:3-25).]

De Grosz knew he wanted to act quickly to capitalize on the ABD brand equity because "ABD is a strategic advantage and we need to get it out fast."  [Boyd Decl., Ex. QQ.]  Defendants made sure that potential business partners were aware that two of ABD's founders, de Grosz and Basso, were on the Board of Advisors for the soon to be "re-launched ABD."  [Boyd Decl., Ex. R.]  Defendants also advised potential investors that the new company would most likely use the name "ABD Insurance and Financial Services (sic) [because] *[t]here is a ton of brand equity in this name*, as there was a company called ABD that existed in the Bay Area, as a high-end boutique for 35 years, from 19xx-2007."  [Boyd Decl., Ex. Q.]  Defendants knew that appropriating a name owned by another entity would have legal

consequences, but they boldly advised potential investors that Wells Fargo was unlikely to sue [Boyd Decl. Ex. P.][3]

Defendants worked immediately to launch their new business as the original ABD brokerage, as they had promised investors and lenders they would do.  Defendants concealed from customers the fact their business was a start-up with zero ties or relationship to the ABD brokerage now owned by Wells Fargo, and even told them that they could "rest assured we are not a startup," but in fact "the old ABD."  [Boyd Decl., Ex. RR]  One of the Defendants sent an email to every one of his contacts, telling them, "I'm excited to let you know we launched our new insurance brokerage firm ABD Insurance and Financial Services. We were ABD prior to Wells acquiring us and we are now ABD again.  Significant change but we're very excited. The website is.www.theabdteam.com."  [Boyd Decl., Ex. SS.]  These are not isolated instances.  [*See e.g.* Boyd Decl. Exs. V, W, X, Y, Z, CC, DD, KK, RR, SS, AAA.]

   **D.     Wells Fargo Learns of Defendants' Plan and Takes Action to Prevent Defendants from Illegally Using the ABD Mark But Defendants Appropriate and Exploit the ABD Brand and Associated Goodwill Anyway.**

The day before it opened its doors for business as ABD, Defendants approached Wells Fargo with an offer to buy Wells Fargo's Bay Area insurance business, including the ABD business and its associated intellectual property.  [Lane Decl., ¶ 18; Boyd Decl., Ex. T]  In July 2012, after learning that Defendants were using the ABD name and associated goodwill to promote their brand new company, Wells Fargo sent them a letter demanding they desist. [Boyd Decl., Ex. S]  Defendants did not respond.  Instead, they went ahead and changed their new company's corporate name to ABD Insurance and

---

[3] Significantly, the documents generated during the summer of 2012, while plainly indicating Defendants' intent to misappropriate the goodwill in the ABD name, do not include the totality of such documents that should have been produced in this litigation.  Defendants' employees, such as Rod Sockolov, have admitted to intentionally destroying documents that were created during the infancy of Defendants' rebranding efforts and which presumptively would have shown the fuller extent to which Defendants relied upon the ABD name to launch their business and recruit key employees and clients away from Wells Fargo.  [See, e.g., Boyd Ex. TT (Deposition of Rod Sockolov 22:7-16, 23:21-24:10).]

1   Financial Services, Inc.—*the very name of the business that has belonged to Wells Fargo since 2007*.

2   [Boyd Decl., Ex. EEE.]   Defendants also stepped up their efforts to recruit Wells Fargo employees to

3   join their company, focusing on legacy ABD employees.  [Lane Decl., ¶¶ 18-19; Volkel Decl., ¶¶ 2, 16;

4   Boyd Decl., Ex. AA.]

5           Just days after Wells Fargo sent its letter asking them to stop using the ABD mark, Defendants

6   began doing business *as ABD*, falsely informing the world that their "re-launched" company was a

7   continuation of the company Wells Fargo had acquired.  [Boyd Decl., Ex. V, W, X.]  Defendants

8   repeated this refrain again and again to potential customers and market contacts. For example,

9   Wells Fargo told prospects, "ABD is back!"  [Boyd Decl., Ex. Y.]  In client presentations, Defendants

10  sought to "introduce ourselves, or rather *reintroduce* ourselves," conflating their newly launched

11  company with the historical one that Wells Fargo had purchased.  [Boyd Decl., Ex. Z (emphasis

12  added)]  Calling themselves the "ABD team," members of the new company sent emails to potential

13  customers and business associates telling them, "we've decided to bring back our former company and

14  *relaunch ABD*,"  [Boyd Decl., Ex. DD (emphasis added).]   One employee thanked a customer for

15  "considering a move to ABD (I should say *back to ABD*)."  [Boyd Decl., Ex. CC (emphasis added)]

16  Another employee emailed a customer, stating: "You may recognized (sic) the name—we were ABD

17  Insurance before our parent was purchased by Wells. We are lucky and grateful to have the identity

18  returned to us." [Boyd Decl.Ex. AAA.]  Defendants went so far as to tell prospects, "You are familiar

19  with the old ABD … you can rest assured we are not a startup," [Boyd Decl., Ex. RR], and to claim

20  rights to the brand's "history," [Boyd Decl., Ex. KK.]

21          Defendants knew they were capitalizing on Wells Fargo's brand.   [Boyd Decl., Ex. P ("We will

22  leverage the brand equity in the ABD name").]  Defendants' 2012 business plan, entitled "ABD 2.0,"

23  acknowledged that ABD belongs to Wells Fargo, but referred to the company as "abd," using "ABD"

24  to designate their new company.  [*Id.*]

25          At the same time, Defendants sought to persuade potential customers that Wells Fargo was

26  unable to provide the brokerage services they needed by falsely stating that all or substantially all of

27  Wells Fargo's critical San Carlos office had left Wells Fargo to join Defendants, leaving nobody at

28  Wells Fargo to service client accounts.  For example, when one prospect confused by the "re-launch"

announcement asked:  "Quick question – does this mean you will be a part of ABD Wells Fargo?"
Defendant ABD responded, "No not Wells Fargo (sic) We became ABD, and all the Wells folks left
and Join (sic) our firm."  [Boyd Decl., Ex. EE (emphasis added)].  Another employee told a prospect
that "we got ABD back together again.  The ABD Team (all 85 of us) left Wells Fargo on Friday to re-
launch ABD 2.0."  [Boyd Decl., Ex. FF.]  *See also* [Boyd Decl., Ex. AA] ["We launched our new
brand today with the addition of 75 new team members from the legacy ABD operation"]; [Boyd
Decl., Ex. BB] ["we are not really 'new' – most of us are legacy ABD"].

In July 2012, Wells Fargo brought suit against Defendants, alleging claims for violations of the
Lanham Act and unfair business practices under California law.  [Boyd Decl., Ex. U]

**E.      The "Relaunch" of ABD Fosters Confusion in the Marketplace and Bewilders
          Upstream and Downstream Customers Alike.**

Insurance brokerages serve as intermediaries during insurance purchases, linking insurance
policy providers with end consumers by distributing policies and providing advisory services to
businesses and consumers.   [Holt Decl. ¶ 13.]  As an insurance broker, Wells Fargo thus has both
upstream customers (insurers) and downstream customers (purchasers of insurance).  Both types of
customers were confused as a result of Defendants' wrongful conduct.

On July 27, 2012, the *San Francisco Business Times* ran an article under the headline "ABD
Rises Again" in which Defendant Hetherington boasted that the "new" "ABD" was "the fastest-
growing broker in the country right now."  [Boyd Decl., Ex. J.]  At least one well known website,
Bloomberg Businessweek, was unable to distinguish between the two ABDs, listing Defendants' phone
number and address mixed with Wells Fargo's executives and website. The website states that "[a]s of
2008, ABD Insurance and Financial Services, Inc. was acquired by Wells Fargo Insurance Services,
Inc. …. [and] provides insurance brokerage, risk management, and employee benefits consulting
solutions and services in the United States."  It then announces that "ABD Insurance & Financial
Services" has added executives, and goes on to list executives at Defendants' new company.  [Boyd

Decl., Ex. OO.][4]  The confusion continues to this day.  Similarly, other third parties still see ABD as wholly owned by Wells Fargo.  [Boyd Decl., Ex. BBB ("ABD Insurance and Financial Services is a major regional insurance brokerage, employee benefits and risk management consulting firm and a proud member of the Wells Fargo family of companies.") and Ex. CCC ("Abd Insurance Financial Services A Wells Fargo Company").]

Insurance clients—Wells Fargo's potential downstream customers—immediately expressed confusion.  Here are a few examples:

- On July 19, a prospective client emailed, "Nice move to pick up the residual ABD brand equity. There is still plenty of it out there. … I am delighted to see you all making this move and wish you and the rest of my friends there all the best.  Enjoy the ride! One hell of a lot better than being a captive passenger (prisoner?) on that f—ing stage coach." [Boyd Decl., Ex. GG];

- On July 25, another prospect emailed, "Hi Rod. I didn't realize you were back to ABD. Did you buy the business back from Wells?" [Boyd Decl., Ex. SS];

- On July 25, 2012, in response to a solicitation from Defendant ABD, a prospect emailed, "I guess I am confused.  I thought Wells Fargo acquired ABD a few years back."  [Boyd Decl., Ex. HH];

- On July 26, 2012, when an employee informed a prospect he had resigned and joined "the new ABD," the prospect replied that "…I heard the term 'the new ABD' but I thought people were still referring to the Wells Fargo owned ABD – I guess not." ABD12475.  [Boyd Decl., Ex. II];

- Responding to a launch announcement from Impostor ABD, a prospect responded, "I thought Wells Fargo retained the rights to use the ABD name.  Is this the same ABD agency?  It was a great firm." ABD8658.  [Boyd Decl.,  Ex. JJ];

- Another target of Defendants' solicitation efforts responded: "Quick question – does

_____

[4] See Bloomberg Businessweek website:  http://investing.businessweek.com/research/stocks/ private/snapshot.asp?privcapId=1437117 (last viewed June 5, 2014.

this mean you will be a part of ABD Wells Fargo?" [Boyd Decl., Ex. EE.]; and

- On March 8, 2014, a potential client responded to Defendants' solicitation by asking "I am curious – are you part of the old ABD that merged with Wells or Woodruf – I can't remember and then exited[?]" Defendants responded – incorrectly – by stating "Yes, we were initially purchased in 2007 and after 4.5 year decided to exit." [Boyd Decl., Ex. FFF.]

Social media sites were, and remain, confused about ABD. To this day, Yelp continues to host an entry for "ABD Insurance and Financial Services – Walnut Creek" which lists the corporate website as cybersure.com (a Wells Fargo website) and in which the commenter states "ABD is now a division of Wells Fargo, which makes them and even better reason to come to for your insurance needs." [Boyd Decl., Ex. UU]. Similarly, LinkedIn's "ABD Insurance and Financial Services" page refers to the Wells Fargo, the public entity with 500-1000 employees. [Boyd Decl., Ex. ZZ.] Defendants were not only aware of the confusion but they warned their employees "MAKE SURE YOU DO NOT ASSOCIATE YOURSELF WITH THE GROUP NAME CALLED 'ABD INSURANCE AND FINANCIAL SERVICES . . . This is the old Wells Group." [Boyd Decl., Ex. LL.]  This confusion so concerned Defendants that they reached out to the Senior Director of Corporate Services at LinkedIn and the CFO at Yelp to remove the entries. [Boyd Decl., Ex KK.] The consumer confusion at Yelp and LinkedIn is particularly telling here because *Yelp and LinkedIn are customers of Defendants that they stole from Wells Fargo*. [Boyd Decl., Exs. LL, KK.]

Insurance carriers—upstream customers—were also confused. For example, in 2008, ABD (as owned by Wells Fargo) became the broker of record ("BOR") for a new customer, BioMarin, with a formal BOR letter listing "ABD" as the authorized insurance broker for the client. From 2008 until July 2012, BioMarin's insurance carrier recognized Wells Fargo as the BOR. But when Wells Fargo requested a loss report on the BioMarin account from insurer CNA in August 2012, CNA refused to provide the report due to confusion about Wells Fargo's status as broker of record in light of Defendants' having taken the ABD name. CNA demanded that Wells Fargo obtain further authorization from BioMarin before granting Wells Fargo access to the BioMarin account. The delay led to loss of the BioMarin account. [Holt ¶ 41; Lane Decl., ¶¶ 21-26; Volkel Decl., ¶¶ 13-14 and Ex.

B; Dkt. 64 (Bingham Decl.), ¶ 3; Dkt. 63 (Bartolo Decl.), ¶ 4.]

Defendants' unauthorized use of the ABD mark has caused confusion in several other documented instances as well.  At least one insurance company mistakenly provided client information to Wells Fargo (designated to "ABD") because of their confusion over the Defendants' use of the ABD name. [Lane Decl., ¶¶ 22-26; Volkel Decl., ¶¶ 13-14, 17; Dkt. 64 (Bingham Decl.), ¶ 3; Dkt. 63 (Bartolo Decl.), ¶ 4.]

Defendants should not be surprised by this market-wide confusion as they had deliberately created and sought to profit from it.  In August and September 2012, after Defendants had already sowed the seeds of confusion and Wells Fargo had filed the instant lawsuit, Defendants advised their employees to stop using language like "ABD again" or "reintroducing ABD" in order to distance themselves from the very confusion they had created and profited from. [Boyd Decl., Ex VV; *see also* (Defendant de Grosz's email telling employees to stop using "ABD Insurance and Financial Services" in social media "so there is no confusion"), Ex. XX (emails from de Grosz and a sales manager telling employees to avoid creating the impression that ABD and Defendants were affiliated)].

The continued misuse of the ABD brand and history by Defendants' employees is not surprising. Defendants have failed to implement any policies, procedures, or audits to ensure that employees do not make admittedly confusing statements. [Boyd Decl. Ex. HHH (Deposition of Rod Sockolov, at 141:14-145:15).]   Similarly, Defendants provided no direction to employees to not destroy customer presentations or communications using the ABD name.  [*Id.*, at 97:11-100:16; Boyd Decl. Ex. III (Deposition of Darren Brown, at 75:7-77:13).]

The market confusion has caused repeated and continuing loss of business to a degree that is impossible to quantify.  [Holt Decl. ¶¶ 43-59.]

### F.    Wells Fargo Continues to Suffer Irreparable Harm.

By mid-October 2012, Wells Fargo had lost more than 200 customer accounts and several million dollars of annualized revenue due to the activities of the "re-launch[ed]" ABD.  [Lane Decl., ¶ 20; Volkel Decl., ¶¶ 2, 17.]  Wells Fargo thus has a substantial damages claim against Defendants. Much of the harm Wells Fargo has experienced and continues to experience, however, is difficult, if not impossible, to quantify.  [Holt Decl. ¶¶ 6-7, 36]

For example, Wells Fargo has lost and continues to lose much of the goodwill it purchased when it bought ABD, a company with industry-wide recognition, to create a business that customers would recognize and trust.   By subverting the ABD brand for their own purposes, Defendants diminished the value that the brand conveyed to Wells Fargo.  At the same time, by falsely claiming to be a reincarnated ABD, Defendants have devalued the company owned by Wells Fargo, making it seem inauthentic.  By leading the public to believe that Defendants *are ABD*, Defendants have created the impression that Wells Fargo could not be the owner of ABD.  [Holt Decl. ¶¶ 37-40.]

Wells Fargo has also lost the benefit of the association it forged with the ABD name after it bought the company.  The existence of a competing company with the same name has caused and will continue to cause severe and irreversible damage to the consumer perception of ABD and, by extension, Wells Fargo.  Defendants' use of the name does not just associate the Defendants with Former ABD, but taints Wells Fargo's association with the name.  [Holt Decl. ¶¶ 37-40.]  Over twenty people per day call looking for ABD, but call Wells Fargo's old telephone number.  [Boyd Decl., Ex. GGG.]

Defying belief, Defendants have argued at various times that the ABD mark is essentially worthless.  While many of the Defendants' witnesses claimed that there was absolutely no value or good will associated with the ABD mark, in a moment of honesty, one of Defendants' witnesses admitted that retaining the mark was an "asset" and gave customers and employees a feeling of "comfort" and "familiarity" that they were working for a continuation of ABD, not a start-up.  [Boyd Decl. Ex. HHH (Sockolov Depo. at 81:2-7)].  This is good will and Defendants stole it.

### G. The Ninth Circuit Court of Appeals Concludes that Wells Fargo did not Abandon the ABD Trademark and Reverses the Order Denying Wells Fargo Injunctive Relief

This Court denied Wells Fargo's motion for injunctive relief in March 2013 and Wells Fargo appealed.  On December 20, 2013, the Ninth Circuit reversed this Court's denial of plaintiff's motion for preliminary injunction and remanded for action consistent with its decision. (App. Dkt. 33-1.)  The Ninth Circuit ruled that the Defendants' arguments for trademark abandonment were foreclosed as a matter of law because Wells Fargo had shown that it had continued to use the ABD trademark.  (*Id.* at 4-6.)  The Ninth Circuit also cautioned this Court not to rest its determination as to likelihood of

confusion on evidence of actual confusion, which is of "diminished importance" in the preliminary injunction setting.  (*Id*. at 6-7.)  The Court also remanded for consideration of Wells Fargo's false advertising and false affiliation claims, which are distinct from its infringement claim.  *Id*.

On the abandonment issue, the Ninth Circuit concluded that "[i]n this case, Wells Fargo continued to use the mark in several ways, most notably in customer presentations and solicitations. Such uses demonstrate Well Fargo's business calculation that it could continue to benefit from the goodwill and mark recognition associated with ABD, and we conclude that Wells Fargo continued its bona fide use of the mark in the ordinary course of business through these uses." (App. Dkt. 33-1 at p. 6.)

On January 10, 2014, Defendants filed a petition for rehearing with the Ninth Circuit.  The Defendants' petition asked the Ninth Circuit to reconsider its ruling that Wells Fargo had continued to use the ABD mark in several bona fide ways.  The Ninth Circuit declined to modify this part of its ruling when it denied Defendants' petition on February 6, 2014.  The Ninth Circuit did, however, amend its Dec. 20, 2013 Order to specify that it was not reaching the issue of irreparable harm because when the district court analyzed irreparable harm, it did not have the benefit of the 9th Circuit's recent opinion in *Herb Reed Enterprises v. Florida Entertainment Management*, 736 F.3d 1239 (9th Cir. 2013).  Finally, the Court of Appeals instructed the Court and the parties to evaluate harm to Wells Fargo in light of its recent decision in *Herb Reed,* which, as the Court pointed out, indicates that "[e]vidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm." (App. Dkt. 37 at p. 2.)

### III.   ARGUMENT

**A.   Wells Fargo is Likely to Succeed on the Merits of One or More of its Claims.[5]**

**1.   Wells Fargo is likely to succeed on its claim for trademark infringement.**

To succeed with its claim for trademark infringement under Section 43(a) of the Lanham Act,

---

[5] "A party seeking an injunction need not demonstrate likelihood of success on the merits of all claims." *Power Balance LLC v. Power Force LLC*, 2010 WL 5174957 (C.D. Cal. 2010)).

Wells Fargo must demonstrate that (1) it owns a valid trademark and (2) defendants' use of the mark is likely to cause confusion, mistake, or deception.  15 U.S.C. § 1125(a)(1); *see, e.g., Applied Info. Scis. Corp. v. eBAY, Inc*., 511 F.3d 966, 969 (9th Cir. 2007).  Likelihood of confusion is determined based on a totality of the circumstances, taking into account the so-called *Sleekcraft* factors: "[1] strength of the mark; [2] proximity of the goods; [3] similarity of the marks; [4] evidence of actual confusion; [5] marketing channels used; [6] type of goods and the degree of care likely to be exercised by the purchaser; [7] defendant's intent in selecting the mark; and [8] likelihood of expansion of the product lines." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc*., 638 F.3d 1137, 1145 (9th Cir. 2011) (quoting *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir.1979)).

This Court overruled Wells Fargo's claim the first time around largely because it accepted Defendants' argument that Wells Fargo had abandoned the ABD mark.  The Ninth Circuit determined to the contrary that, "Wells Fargo continued to use the mark in several ways, most notably in customer presentations and solicitations. Such uses demonstrate Wells Fargo's business calculation that it could continue to benefit from the goodwill and mark recognition associated with ABD, and we conclude that Wells Fargo continued its bona fide use of the mark in the ordinary course of business through these uses." *Wells Fargo*, __ F.3d __, 2014 WL 806385 at *3.  Because Wells Fargo has continued its bona fide use of the ABD mark, Defendants cannot succeed on a renewed abandonment defense.

This Court also found there was no likelihood of confusion, based primarily on its finding that there was insufficient evidence of *actual* confusion.  The Ninth Circuit ruled that this, too, was error, because actual confusion is of "diminished importance" at the preliminary injunction stage, where discovery is still in its initial phase.  *Wells Fargo*, __ F.3d at __2014 WL 806385 at *3 (citing *Network Automation,* 638 F.3d at 1151).  The Court of Appeals directed this Court on remand to examine the "totality of the circumstances," taking into account all of the *Sleekcraft* factors, the majority of which undisputedly favor Wells Fargo.[6]

---

[6] With additional time and additional defense productions, Wells Fargo has been able to more thoroughly review the available evidence and present it to the Court.  As such, Wells Fargo is able to provide dozens of additional pieces of evidence that were not available at the time of the first motion.

1    As this Court found in its original order, factor (7) "weighs decisively in favor of Wells Fargo,"

2  [Dkt. 85, at 17], and there is no dispute as to factors (1), (2), (3), and (5), [*Id*. at 14-15].  The parties

3  agree that the services to which the mark is tied are the same; the parties are using the same mark; and

4  the parties are using the mark in the same marketing channels.  While Defendants have intimated in

5  briefing that they dispute factor (1) (that the mark is strong), their argument pales in the face of their

6  pre-litigation statements that "there is a ton of brand equity in this [ABD] name" and the fact that

7  Defendants appropriated the exact same mark and refuse to disgorge it.  [Boyd Decl., Ex. Q.]

8  Similarly, factor (7) (likelihood of expansion of products) is of diminished importance here but still

9  weighs strongly in Wells Fargo's favor because the marks are identical and Defendants have *already*

10  expanded to unfairly compete against Wells Fargo in virtually type of insurance brokerage market.

11  "Inasmuch as a trademark owner is afforded greater protection against competing goods, a 'strong

12  possibility' that either party may expand his business to compete with the other will weigh in favor of

13  finding that the present use is infringing." (*Sleekcraft*, 599 F.2d at 354).  Here, there is more than a

14  strong possibility; the expansion has already occurred.

15    That means that five of seven relevant factors support likelihood of confusion, leaving only two

16  factors to seriously consider – factor (4) (evidence of actual confusion), and factor (6) (the degree of

17  care likely to be exercised by the purchaser).  Factor (4) supports likelihood of confusion, and factor

18  (6) does not weigh against it.

19    While actual confusion is not required to prove likelihood of confusion, and is of "diminished

20  importance," *Wells Fargo*, __ F.3d __, 2014 WL 806385 at *3, Wells Fargo's evidence of actual

21  confusion is a strong indicator of likelihood of confusion, *Rearden LLC,* 683 F.3d at 1210.  "Evidence

22  of actual confusion constitutes persuasive proof that future confusion is likely. …  If enough people

23

24  However, it is likely Wells Fargo will never have the benefit of all of the relevant evidence because

25  Defendants, including Rod Sockolov and Brian Hetherington, <u>destroyed clearly relevant documents</u>

26  <u>when they discovered litigation was on the horizon</u>.  [*See* Boyd Decl. Ex. TT (Deposition of Rod

27  Sockolov 22:7-16, 23:21-24:10), Ex. MMM (ABD's response to Wells Fargo Interrogatory 20).]

28

have been actually confused, then a likelihood that people are confused is established." *Thane Intern., Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 902 (9th Cir. 2002); *see also Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837 (9th Cir. 1987).   *See* page 11, *supra*, setting forth examples of actual confusion among upstream and downstream customers.

This Court originally found that factor (6) -- the type of goods and the degree of care likely to be exercised -- weighed in Defendants' favor based on its finding that the parties are competing in a "sophisticated industry" and its dismissal of early evidence of confusion.  Even in a sophisticated industry, however, "virtually no amount of consumer care can prevent confusion where [as here] two entities have the same name." *Electropix, Inc. v. Liberty Livewire Corp.*, 178 F. Supp. 2d 1125, 1134 (C.D. Cal. 2001).  Wells Fargo has demonstrated that even sophisticated entities like Bloomberg cannot distinguish between the two companies.

Furthermore, it is widely recognized that infringement can be based on confusion that creates *initial consumer interest*, even if the confusion is ultimately dispelled.  *Playboy Enterprises, Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1024-25 (9th Cir. 2004).  "The core element of trademark infringement is whether the similarity of the marks is likely to confuse customers about the source of the products....  Initial interest confusion occurs when the defendant uses the plaintiff's trademark 'in a manner calculated to capture initial consumer attention, even though no actual sale is finally completed as a result of the confusion." *Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002, 1018 (9th Cir. 2004) (citations and quotations omitted).  "Initial-interest confusion gives the junior user credibility during the early stages of a transaction and can possibly bar the senior user from consideration by the consumer once the confusion is dissipated." *Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d 188, 204 (5th Cir. 1998).

In *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036 (9th Cir. 1999), for example, the Ninth Circuit held that by using a website it called "moviebuff.com" "to divert people looking for "MovieBuff" to its [own] web site, … [defendant] improperly benefits from the goodwill that [plaintiff] developed in its mark." *Id.* at 1062 (citations omitted).

Here, Defendants have done just that.  Defendants use the very name and goodwill that Wells Fargo purchased to promote its own business, confusing even the most sophisticated customers and astute media observers (such as Bloomberg) as to the company designated by the ABD mark.  Even if

1   the confusion can be or has already been dispelled in some cases, factor (6) does not help Defendants.

2   In sum, there is no question that the vast majority, if not all, of the relevant *Sleekcraft* factors

3   demonstrate a likelihood of confusion.  Accordingly, this Court should find that Wells Fargo is likely

4   to succeed on its infringement claim.

5   **2.  Wells Fargo is likely to succeed on its false affiliation claim.**

6   A claim under Section 43(a)(1)(A) (as distinct from a false advertising claim under Section

7   43(a)(1)(B), discussed below) is commonly referred to as a "false association" or "false affiliation"

8   claim.  *Jack Russell Terrier Network of N. Ca. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1037 (9th Cir.

9   2005).[7]

10  This section of the Lanham Act "aims to protect trademark owners from a false perception that

11  they are associated with or endorse a product."  *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d

12  792, 806-07 (9th Cir. 2003) (citing *Cairns v. Franklin Mint*, 292 F.3d 1139, 1149–50 (9th Cir. 2002)).

13  To evaluate a false affiliation claim, the court "asks whether use of the plaintiff's trademark by the

14  defendant is 'likely to cause confusion or to cause mistake, or to deceive as to the affiliation,

15  connection, or association' of the two products."  *Id*. at 807 (quoting 15 U.S.C. § 1125(a)(1)(A)).

16  Courts in this Circuit have not hesitated to find a Section 43(a)(1)(A) violation where one

17  company creates a false affiliation or association by misusing someone else's name.  In *Abdul-Jabbar*

18  *v. General Motors Corp.*, 85 F.3d 407 (9th Cir. 1996), for example, the Ninth Circuit held that a car

19  manufacturer's use of an athlete's name (Lew Alcindor) to imbue its product with the aura associated

20  with that athlete was actionable even though the athlete himself had elected to use a different name

21  (Kareem Abdul-Jabbar).  *Id*. at 412-13.  And in *Summit Tech., Inc. v. High-Line Med. Instruments, Co*.,

22  933 F. Supp. 918 (C.D. Cal. 1996), the court found that a company that purchased a used medical laser

23  could be liable under the statute for implying it had an "agency relationship" with the manufacturer of

24  the laser.  *Id*. at 929-30.

25  Here, Defendants have gone far beyond implying an association to Wells Fargo's ABD.  They

26  _____

    [7] Unlike the trademark claim discussed above, false affiliation (and false advertising) do not

27  require proof of a mark.

28

are actually holding themselves out as that very entity.  By riding the coat tails of Former ABD's goodwill, Defendants are improperly capitalizing on the brand name now owned by Wells Fargo and are deliberately creating a false perception that Former ABD and their new company are affiliated. Accordingly, this Court should find that Wells Fargo is likely to prevail on its false affiliation claim against Defendants.

### 3.   Wells Fargo is likely to succeed on its false advertising claim.

To prove a false advertising claim under the Lanham Act, § 1125(a)(1)(B), Wells Fargo needs to show that: (1) Defendants made one or more false statements of fact in a commercial advertisement about its own or Wells Fargo's services; (2) the statement(s) actually deceived or has (or have) the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) Defendants caused their false statement(s) to enter interstate commerce; and (5) Wells Fargo has been or is likely to be injured as a result of the false statement(s), either by direct diversion of sales from itself to defendants or by a lessening of the goodwill associated with its products.  15 U.S.C. § 1125(a)(1)(b) (2008); *Southland Sod Farms v. Stover Seed Co*., 108 F.3d 1134, 1139 (9th Cir. 1997).[8]

The record shows that Defendants created a pattern of misleading and false statements designed to capitalize on Wells Fargo's goodwill in ABD and to mislead consumers into thinking that by doing business with Defendants, they were actually doing business with ABD.  Defendants repeatedly misled customers with false statements implying that they were "re-launching ABD" to direct customers away from Wells Fargo.  Defendants masqueraded as a faux-continuation of the business that Wells Fargo purchased in 2007; that is impossible and false.  *E.g*., "ABD is back!"  [Boyd Decl., Ex. Y.]  "Allow us to introduce ourselves, or rather reintroduce ourselves."  [Boyd Decl., Ex. Z.]  "I wanted to let you know that we've decided to bring back our former company and relaunch ABD."  [Boyd Decl., Ex. DD.]

_____

[8] Section 43(a) contains no requirement concerning a mark.  *Waits v. Frito Lay*, 978 F.2d 1093, 1107 (9th Cir. 1992).

1   Defendants also falsely represented that they had recruited all legacy ABD employees from

2   Wells Fargo to imply that Wells Fargo could not handle the remaining accounts. *E.g.*, "We became

3   ABD, and all the Wells folks left and Join (sic) our firm." [Boyd Decl., Ex. EE]; "we got ABD back

4   together again. The ABD Team (all 85 of us) left Wells Fargo on Friday to re-launch ABD 2.0."

5   [Boyd Decl., Ex. FF.]

6   Courts routinely find that these kind of statements actionable under the false advertisement

7   prong of the Lanham Act. *E.g., Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1111 (9th Cir.

8   2012) (affirming trial court's determination that sky diving website was both misleading and literally

9   untrue when it implied an association with a sky diving facility); *TrafficSchool.com, Inc. v. Edriver*

10  *Inc.*, 653 F.3d 820, 827-828 (9th Cir. 2011) (finding that DMV.org website was misleading because it

11  implied the site was affiliated with the California state department of motor vehicles).

12  **B.    Injunctive Relief Is Needed to Prevent Ongoing Irreparable Harm to Wells Fargo.**

13  It is well-established that "'[e]vidence of loss of control over business reputation and damage to

14  goodwill'" may constitute irreparable harm. *Wells Fargo*, __ F.3d at __2013WL ____ at *4 (quoting

15  *Herb Reed*, 736 F.3d at 1247) (citing *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co., Inc*., 240

16  F.3d 832, 841 (9th Cir. 2001) (holding that evidence of loss of customer goodwill supported finding of

17  irreparable harm). *See also Re/Max N. Cent., Inc. v. Cook*, 272 F.3d 424, 432 (7th Cir. 2001) ("We

18  have clearly and repeatedly held that damage to a trademark holder's goodwill can constitute

19  irreparable injury for which the trademark owner has no adequate legal remedy."); *Lettuce Entertain*

20  *You Enters., Inc. v. Leila Sophia AR, L.L.C.*, 703 F. Supp. 2d 777, 790 (N.D. Ill. 2010) (explaining "it

21  is virtually impossible to ascertain the precise economic consequences of intangible items, such as

22  damage to reputation and loss of goodwill"). Loss of control over business reputation and damage to

23  goodwill are precisely the harms at issue here.

24  Specifically, there was considerable goodwill in the ABD name when Wells Fargo acquired it,

25  and considerable value in the business reputation associated with the ABD Insurance and Financial

26  Services brokerage that Wells Fargo purchased. Defendants' actions have caused Wells Fargo to lose

27  control over that goodwill and reputation, and, worse, have caused that goodwill and reputation to be

28  associated with a business other than Wells Fargo. Wells Fargo has lost control over the reputation

associated with the ABD name because, obviously, there is a company that Wells Fargo does not control that is illegitimately using that name.  The reputational and goodwill damage is difficult, if not impossible, to quantify.  Accordingly,  Wells Fargo lacks an adequate remedy at law for this damage. *Mortgage Elec. Registration Sys. v. Brosnan*, No. C09-3600, 2009 U.S. Dist. LEXIS 87596, at *24-26 (N.D. Cal. Sept. 4, 2009); *Stuhlbarg*, 240 F.3d at 841; *Rent-a-Center, Inc. v. Canyon Television & Appliance*, 944 F.2d 597, 603 (9th Cir. 1991).

Wells Fargo has also suffered and continues to suffer irreparable harm to its client base. Defendants have solicited Wells Fargo's customers using the ABD brand and falsely suggested that their company is a continuation of ABD, the business Wells Fargo bought and continued.  Thanks to Defendants' conduct, Wells Fargo has lost scores of customers representing millions of dollars in lost revenue, and Wells Fargo stands to lose even more customers who are confused or are under the wrong impression that Defendants are legitimately continuing the original ABD business and are authorized to use the ABD name.  [Lane Decl., ¶¶ 24-25; Volkel Decl., ¶¶ 2, 14-15.]  Because of the nature of the insurance brokerage business, customers who leave Wells Fargo are unlikely to return any time soon, if at all.  [Holt Decl. ¶ 51.]

Since customers who leave a brokerage business tend to leave for good, a lost customer potentially represents a sizeable, variable, and complex future income stream with compounding effects that will linger for a long time.   This makes the profits very difficult to capture.  These impacts can be expected to continue in the absence of injunctive relief.   [Holt Decl. ¶ 52.]   Between the irreparable damage to Wells Fargo's client base and the reputational and goodwill damage that the Ninth Circuit invoked, Wells Fargo has clearly suffered and will continue to suffer irreparable harm due to Defendants' conduct.

**C.    The Balance of Hardships Favors Wells Fargo.**

The balance of hardships unquestionably tips in favor of Wells Fargo.  The harm to Wells Fargo – loss of goodwill and customers that may never return – far outweighs any harm to Defendants if they are enjoined from using a mark they do not own and should not be using in the first place. Defendants will be free to continue to engage in the insurance brokerage business.  They will just need to select a different name to promote their business.  *SunEarth Inc.,* 846 F. Supp. 2d at 1084.

**D.      The Public Interest Favors Injunctive Relief.**

"In trademark cases, this factor is often addressed in terms of the public's right 'not to be deceived or confused." *Moroccanoil, Inc. v. Moroccan Gold, LLC*, 590 F.Supp.2d 1271, 1282 (C.D. Cal. 2008) (quoting *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 198 (3d Cir. 1990). Unless and until Defendants are enjoined, customers will continue to be harmed. Because an injunction will clear up the confusion Defendants have fomented in the marketplace, it is decidedly in the public interest.

## IV.      <u>CONCLUSION</u>

Immediate injunctive relief is necessary to prevent any further damage to Wells Fargo and its ABD brand. Because Wells Fargo is likely to succeed on the merits of at least one, if not all, of its claims, this Court should grant the requested relief.

Dated: June 12, 2014                    **BARNES & THORNBURG LLP**


                                        By*:  s/Felicia Boyd*
                                        Attorneys for Plaintiffs WELLS FARGO & COMPANY
                                        and WELLS FARGO INSURANCE SERVICES USA,
                                        INC.