1  KEVIN D. RISING (SBN 211663)
   Kevin.Rising@btlaw.com
2  DEVIN J. STONE (SBN 260326)
   devin.stone@BTLaw.com
3  **BARNES & THORNBURG LLP**
   2049 Century Park East, Suite 3550
4  Los Angeles, CA 90067
   Telephone:  310-284-3880
5  Facsimile:   310-284-3894

6  FELICIA J. BOYD (*Admitted Pro Hac Vice*)
   felicia.Boyd@btlaw.com
7  AARON A. MYERS (*Admitted Pro Hac Vice*)
   aaron.myers@btlaw.com
8  **BARNES & THORNBURG LLP**
   225 South Sixth Street, Suite 2800
9  Minneapolis, MN 55402
   Telephone:  (612) 333-2111
10 Facsimile:  (612) 333-6798

11 Attorneys for Plaintiffs
   WELLS FARGO & COMPANY and
12 WELLS FARGO INSURANCE SERVICES USA, INC.

13                UNITED STATES DISTRICT COURT

14       NORTHERN DISTRICT OF CALIFORNIA - OAKLAND DIVISION

15

| | |
|---|---|
| 16  WELLS FARGO & COMPANY and WELLS FARGO INSURANCE SERVICES USA, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>ABD INSURANCE & FINANCIAL SERVICES, INC. (f/k/a INSURANCE LEADERSHIP NETWORK, INC.), d/b/a "THE ABD TEAM"; KURT DE GROSZ; and BRIAN HETHERINGTON,<br><br>Defendants. | Case No.: 4:12-cv-03856-PJH<br><br>**MOTION TO EXCLUDE DECLARATION AND REPORT OF KENNETH A. HOLLANDER**<br><br>Date:   August 21, 2014<br>Time:   9:00 a.m.<br>Courtroom 3, Third Floor<br>The Hon. Phyllis J. Hamilton |

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on August 21, 2014 at 9:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 3, Third Floor, of the above-captioned Court, located at 1301 Clay Street, Oakland, 94612, Plaintiffs Wells Fargo & Company and Wells Fargo Insurance Services USA, Inc., (collectively, "Wells Fargo") will move this Court to exclude the declaration and report of Kenneth A. Hollander from consideration by the trier of fact in this case under Federal Rule of Evidence 702 as set forth in the simultaneously filed proposed order. The motion is based on this notice and supporting memorandum of points and authorities, the accompanying declaration with exhibits, all pleadings and papers on file in this action and such other and further matters as the Court may consider.

Dated: July 17, 2014            **BARNES & THORNBURG LLP**

By: *s/Felicia Boyd*
Attorneys for Plaintiffs
WELLS FARGO & COMPANY and WELLS
FARGO INSURANCE SERVICES USA, INC.

**TABLE OF CONTENTS**

I. INTRODUCTION ...........................................................................................................1

II. BACKGROUND .............................................................................................................2

III. ARGUMENT ...................................................................................................................2

    A. The Standard for Evaluating the Admissibility of Scientific Evidence and Testimony. ..............................................................................................................2

    B. Hollander's Conclusions are Unreliable and Would Not Assist the Trier of Fact. ..5

        1. Hollander's survey examines the wrong issue. ............................................5

        2. Hollander's use of the Eveready design is improper. .................................6

        3. Hollander's survey test and control stimuli are inadequate. .......................7

        4. Hollander's survey population is not clearly defined and is improper. .....10

IV. CONCLUSION ..............................................................................................................12

# TABLE OF AUTHORITIES

## CASES

*Allison v. McGhan Med. Corp.*, 184 F.3d 1300 (11th Cir. 1999) .................................................. 3

*Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311 (9th Cir. 1995) ............................................ 4

*Daubert v. Merrell Dow. Pharm, Inc.*, 509 U.S. 579 (1993) .................................................... 3, 4

*Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600 (9th Cir. 2002) ................................................ 5

*Elsayed Mukhtar v. Cal. State Univ. Hayward*, 299 F.3d 1053 (9th Cir. 2003), *amended by* 319 F.3d 1073 (9th Cir. 2003) ............................................................................................................... 3

*In re Oracle Corp. Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010) ...................................................... 5

*Kennedy v. Collagen Corp.*, 161 F.3d 1226 (9th Cir. 1998) ....................................................... 4

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ............................................................. 3, 4

*Simon & Schuster, Inc. v. Dove Audio, Inc.*, 970 F. Supp. 279 (S.D.N.Y. 1997) ....................... 5

*Star Industries, Inc. v. Bacardi Co. Ltd.*, 71 U.S.P.Q.2d 1026, 2003 WL 23109750 (S.D.N.Y. 2003), *aff'd* (unpublished), 412 F.3d 373 (2d Cir. 2005) .......................................................... 5

*Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*, No. CV 02-2258 JM (AJB), 2007 WL 935703 (S.D. Cal. Mar. 7, 2007) ............................................................................................... 3

*Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366 (7th Cir. 1976) .................................... 5

*United States v. Hermanek*, 289 F.3d 1076 (9th Cir. 2002) ....................................................... 5

## STATUTES

15 U.S.C. § 1125(a)(1)(A) ............................................................................................................. 5

Fed. R. Evid. 702 ............................................................................................................. 2, 3, 4, 12

## OTHER AUTHORITIES

McCarthy, J. Thomas. *McCarthy on Trademarks and Unfair Competition*, Volume 5, 2001…….8, 9, 12

Swann, Jerre B and Shari Diamond, Shari., eds., "Trademark and Deceptive Advertising Surveys".. 8, 9

## I.   INTRODUCTION

In support of its Opposition to Wells Fargo's Renewed Motion for Preliminary Injunction, Defendants offer survey evidence through its proposed expert, Kenneth A. Hollander. Hollander concludes that Wells Fargo's assertion that Defendants' "use of the [name ABD Insurance & Financial Services and/or ABD] is likely to cause confusion" is incorrect. Hollander's survey, and his conclusions, should be excluded from the Court's consideration of Wells Fargo's preliminary injunction motion. Hollander's findings were based on numerous defects in methodology and survey design and tested the wrong premise. These defects include the following:

1. **Hollander's survey examines the wrong issue.** Hollander claims to have designed his survey to test paragraph 38 of the Complaint, *i.e.*, that Defendants' use of the ABD mark is likely to cause confusion, mistake, and/or deception as to the affiliation, connection, or association with Wells Fargo. To accomplish this, Hollander incorrectly compared an edited version of Defendants' website including the ABD name and *the overarching Wells Fargo brand as a whole* rather than comparing Wells Fargo's owned and utilized ABD mark with the use of the same mark by Defendants.

2. **Hollander's use of the *Eveready* design is improper.** Hollander's misunderstanding of the issues in this case lead him to select an improper survey design and, consequently, led Hollander to an unreliable finding.

3. **Hollander's survey test and control stimuli are inadequate.** Hollander's survey only showed respondents the top banners of the test and control companies he sought to test. This is in no way representative of how potential customers encounter websites. Hollander's results show that this error even led the respondents to be confused as to the type of services offered.

4. **Hollander's survey population is not clearly defined and is improper.** Hollander included those who "make or influence" purchasing decisions, but does not define what this means. Further, the majority of his respondents are outside of the market area where Defendants' services are offered. As shown by the survey responses, the target demographic for the survey was not reached.

As Hollander properly pointed out, among other principles, in order to draw reliable conclusions, a survey must: (i) have a properly defined universe; (ii) contain respondents that represent the proper universe; (iii) the survey questions asked should be clear and not leading; and (iv) the survey should be conducted so as to ensure objectivity. (*See* Declaration of Kenneth A. Hollander in Opposition to Wells Fargo's Motion for Preliminary Injunction, ¶ 8. ("Hollander Dec."); *See also*, Manual for Complex Litigation Fourth Edition, 2004, prepared for the Federal Judicial Center.) Hollander's survey failed in each of these respects. It is therefore not surprising that Hollander incorrectly found Wells Fargo's claim "totally without merit." Hollander's survey and his conclusions are fatally flawed, do not meet the criteria of Fed. R. Evid. 702 and should be excluded from the Court's consideration of Wells Fargo's motion for preliminary injunction.

## II.   BACKGROUND

Hollander set out to test what company a respondent thought offered services and if the identified company was connected or affiliated with any other company by showing a title bar to a website, containing a logo, a name and a descriptor, a fragment of what a consumer would view in the marketplace. Hollander's survey utilized a test banner and a control banner, which were rotated in use in an attempt to control for the noise of respondents' possible stimulus-order bias. With regard to the test population, Hollander's survey population was more than half made up of respondents located in areas where Defendants never conducted business. Hollander's survey concluded that 76.2% of survey respondents (228 respondents) had an opinion as to who offered services when presented with the ABD banner and of that 76.2%, 20.3% (46 respondents) identified a specific company, none of which were Wells Fargo. Hollander's survey further concluded that when asked if the company offering services through the banner was connected to or affiliated with any other company, 39.2% thought the company was connected, but none identified Wells Fargo as the affiliated company.

## III.   ARGUMENT

A.   **The Standard for Evaluating the Admissibility of Scientific Evidence and Testimony.**

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the

Supreme Court's opinion in *Daubert v. Merrell Dow. Pharm, Inc.*, 509 U.S. 579 (1993) Rule 702 states: A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.  Fed. R. Evid. 702.

The party offering the expert testimony bears the burden of satisfying Rule 702 by a preponderance of the evidence. *Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*, No. CV 02-2258 JM (AJB), 2007 WL 935703, at *4 (S.D. Cal. Mar. 7, 2007) (citing *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999) (citing *Daubert v. Merrell Dow. Pharm, Inc.*, 509 U.S. 579, 592 n.10 (1993)).

The trial court acts as a "gatekeeper" and must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Elsayed Mukhtar v. Cal. State Univ. Hayward*, 299 F.3d 1053, 1063 (9th Cir. 2003), *amended by* 319 F.3d 1073 (9th Cir. 2003); *Daubert*, 509 U.S. at 592-93. In *Daubert*, the Supreme Court set forth a two-prong test to determine the admissibility of expert testimony: (1) whether the expert's reasoning or methodology is based on reliable principles (the reliability prong); and (2) whether the reasoning or methodology can be properly applied to the facts in issue (the relevancy prong). 509 U.S. at 592-93. Expert testimony is not relevant if it does not allow a reasonable juror to conclude that a proposition is more likely to be true than false. *Cf. Daubert*, 509 U.S. at 591-93.

Under the first prong of *Daubert*, an expert's opinion must be sufficiently reliable. *Id.*; Fed. R. Evid. 702. Reliability analysis ensures that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). The Supreme Court in *Daubert* articulated several factors that a court should consider

when evaluating reliability; however, these factors are not exclusive and a district court is given broad latitude in determining reliability. *Kumho Tire*, 526 U.S. at 152-53; *Daubert*, 509 U.S. at 593-94. The *Daubert* factors include: (1) whether the expert's underlying theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the technique's known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or technique has "general acceptance" in the relevant scientific community. *Daubert*, 509 U.S. at 593-94.

The Advisory Committee has identified several additional factors that a court can consider in the wake of *Kumho Tire*. These factors include: (1) whether experts are "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying"; (2) whether the expert has "unjustifiably extrapolated from an accepted premise to an unfounded conclusion"; (3) whether the expert has "adequately accounted for obvious alternative explanations"; (4) whether the expert "is being as careful as he would be in his regular professional work outside his paid litigation consulting"; and (5) whether the "field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give." Fed. R. Evid. 702 Advisory Committee's Notes (2000 amends.).

Under the second prong of *Daubert*, the expert's testimony must be "relevant to the task at hand, . . . i.e., that it logically advances a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) (quoting *Daubert*, 509 U.S. at 597). To satisfy the relevancy requirement, the expert's opinion must help the trier of fact to reach a conclusion necessary to the case. *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230 (9th Cir. 1998). Expert testimony is not relevant if it does not allow a reasonable juror to conclude that a proposition is more likely to be true than false.

There is no presumption of admissibility under Rule 702 and *Daubert*. To the contrary, the burden is on the proponent of the evidence to show, by a preponderance of the evidence, that the material is admissible as presented. *See Daubert*, 509 U.S. at 592 n.10; *In re Oracle Corp. Sec. Litig.*,

627 F.3d 376, 385 (9th Cir. 2010); *United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002); *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 605 (9th Cir. 2002).

Although the *Eveready* survey format first set forth in *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 385-88 (7th Cir. 1976) is appropriate in certain circumstances, courts have excluded or afforded little weight to *Eveready* surveys when they are not the appropriate format under the facts of the particular case. *See, e.g., Simon & Schuster, Inc. v. Dove Audio, Inc.*, 970 F. Supp. 279, 291, 299 (S.D.N.Y. 1997) (Consumer survey evidence had only limited probative value in determining whether there was actual confusion between author's and publisher's "The Book of Virtues" mark and competing publisher's similar mark; *Eveready* survey measured "top–of–mind" awareness and could have significantly underestimated likelihood of confusion if survey respondents were not familiar with senior users' product); *Star Industries, Inc. v. Bacardi Co. Ltd.,* 71 U.S.P.Q.2d 1026, 2003 WL 23109750 (S.D.N.Y. 2003), *aff'd* (unpublished), 412 F.3d 373 (2d Cir. 2005) (court criticized survey as partially or wholly procedurally flawed where only one of parties products were presented to the respondents).

### B. Hollander's Conclusions are Unreliable and Would Not Assist the Trier of Fact.

#### 1. Hollander's survey examines the wrong issue.

Hollander claims to base his survey design on paragraph 38 of the Plaintiff's Complaint. That paragraph states "Defendants' acts complained of herein violate Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A). Defendants' use of the ABD mark violates Wells Fargo's trademark rights and is likely to cause confusion, mistake and/or deception as to the affiliation, connection, or association of Defendant ABD and its products, services, and commercial activities with Wells Fargo and its products, services and commercial activities. Defendants' acts are further likely to cause confusion, mistake or deception as to the origin, sponsorship, or approval of Defendants' products and commercial activities." (Complaint for Lanham Act Violations, Trademark Infringement, False Advertising and Unfair Competition, July 24, 2012.)

Hollander states that his survey was designed to test if the "Plaintiffs' assertion that the 'Defendants' use of the ABD mark … is likely to cause confusion, mistake, and/deception as to the

affiliation, connection, or association of Defendants' ABD and its products, services, and commercial activities with Wells Fargo and its products, services, and commercial activities' was true." (Hollander Dec., ¶ 58.) He also states that "the two sets of likelihood of confusion questions in this survey … carefully reflect the allegation in Paragraph 38 of the Complaint." (Hollander Dec., ¶ 42.) Hollander's interpretation of this paragraph (at least in the redacted form he presents) appears to be that Wells Fargo's allege confusion between the brand employed by Defendant ABD and *the overarching Wells Fargo brand as a whole*. In context, it is clear that Wells Fargo alleges that confusion has arisen between the ABD brand owned and utilized by Wells Fargo and the ABD mark employed and allegedly misappropriated by Defendants.

It is therefore not surprising that Hollander can find no evidence of confusion as he has designed his survey to determine the existence of confusion surrounding a brand (Wells Fargo) for which neither confusion nor misappropriation has been alleged. Hollander's research design should have examined if respondents who were exposed to Wells Fargo's ABD brand and to the brand employed by Defendants' ABD were confused in the marketplace of insurance service as to their origin. Instead, Hollander's survey is based on a wholly incorrect interpretation of the Plaintiff's Complaint and is completely unsuited to determining whether the confusion exists between the ABD mark owned by Wells Fargo and the mark used by Defendants' ABD. Because Hollander examines the wrong issue, his survey and conclusions will not assist the trier of fact and should be excluded.

**2.      Hollander's use of the Eveready design is improper.**

Hollander's faulty interpretation that confusion surrounding the Wells Fargo brand is the issue in this case led him to select an improper survey design. Hollander selected the Eveready survey design which he describes as "well-established" and what "many consider to be the 'gold standard' protocol for testing likelihood of confusion in trademark litigation." (Hollander Dec., ¶ 32.) These plaudits may be true when the Eveready design is applied to the type of confusion issues for which it is designed, but it is wholly inappropriate in this case. The Eveready format is "especially appropriate when the senior mark is strong and widely recognized," (McCarthy, J. Thomas. *McCarthy on Trademarks and Unfair Competition*, Volume 5, ¶ 32:173.50. 2001), and is used "in cases where the

senior mark is top of mind, i.e., highly accessible in memory, enhancing the likelihood that it will be cognitively cued by a similar junior use." (Swann, Jerre B and Shari Diamond, Shari., eds., "Trademark and Deceptive Advertising Surveys," p. 53.)

An Eveready design relies on whether consumers in the appropriate universe name the senior user of a mark when encountering the junior user's product or service in a representative recreation of a marketplace encounter.  See Declaration of Felicia Boyd in Support of Motion to Exclude Declaration and Report of Kenneth A. Hollander, Ex. A, A Review and Critique of the Hollander Survey, Philip Johnson, July 2014 at p. 9 ("Johnson Critique").  The Eveready survey format is used to prove likely confusion in cases where plaintiff makes some products which defendant does not and is far less likely to reveal confusion if respondents think that the junior mark is the senior mark and do not know the name of the company that puts out the senior mark. (*Id.*)  Another critical factor that dictates the use of the Eveready survey is that the senior mark is a well-known or famous mark. (*Id.* at 10.)

Applying these factors, the use of an Eveready survey is wholly inappropriate in this case.  First, the parties produce identical services and use the same mark, *i.e.,* ABD.  Because of this, there is no ability for a respondent to readily discriminate one company from the other. (*Id.* at 9.)

Once again, Hollander's finding of no confusion is not surprising and not helpful given his flawed survey design.  Survey literature explains that, "for weak marks, an Eveready format will consistently produce negligible estimates of likelihood of confusion." (Swann, Jerre B and Shari Diamond, Shari., eds., "Trademark and Deceptive Advertising Surveys," p. 64.)  As a result of incorrect design selection, Hollander's survey improperly measures the likelihood of confusion between the marks, and should not be relied upon.

### 3. Hollander's survey test and control stimuli are inadequate.

Internet surveys have become more common in recent years. (McCarthy, ¶ 32:165.25.)  In order to be found admissible and reliable, "an Internet based survey must try to replicate as far as possible the actual conditions under which Internet users are likely to encounter the trademarks."

1 (McCarthy, ¶ 32:165.25.)  This goes to the fact that, "most often, a survey is designed to prove the state of mind of a prospective purchaser." (McCarthy, ¶ 32:163.)

Hollander's survey showed respondents only the top banners of the test and control companies he sought to test.  (Hollander Dec., Ex. 2.)  This is in no way representative of how potential customers encounter websites, which consist of more than banners, and are designed to be read, scrolled and examined. Further and equally inadequate, the Hollander survey provides respondents with the following introduction:

> Screen 1:
>
> For each of the questions that follow we're seeking your opinion. That is, there are not "right" or "wrong" answers, so please don't feel the need to guess. If you don't have an opinion or if you're unsure of your opinion, it's perfectly all right to say so.
>
>
>
> Screen 2:
> We're going to show you a screen shot of a website and ask you some questions about it. Please look at it as if you were seriously considering using the company shown in the screen shot. Take as much time as you wish. When you're finished looking at the screen shot, click the "CONTINUE" button.

This introduction suggests that respondents will be shown substantive information about a company that they might "seriously consider using."  However, test cell respondents were then only exposed to the banner of the website.  Hollander wholly failed to account for how the consumer encounters the website and failed to account for the fact that corporate executives do not make a purchasing decision based on a banner.  (Johnson Critique at 13.)

This inadequate test led to a plethora of bizarre responses.  The majority of the respondents (63%) gave responses to the test questions that were completely unrelated to insurance or

financial services; for example, when asked about who the respondent thought offered the service, the responses consisted of: shoe company (8%), nonsense comments (8%), ad testing (5%), fashion or retail (4%), said they had a belief but gave no answer as to who (8%), gave some other unrelated response (6%), or had no opinion about who was offering the service (23%). (Johnson Critique at 15.)

Among the verbatim responses were, for example:

**RESP #50**
**Screen 3.** liked it
**Screen 4.** just do
**Screen 6.** not sure but I think so
**Screen 7.** just do think that

**RESP #59**
**Screen 3.** great
**Screen 4.** Great
**Screen 6.** great
**Screen 7.** Great

**RESP #65**
**Screen 3.** it looks good
**Screen 4.** it looks good to me
**Screen 6.** Connected
**Screen 7.** it looks like it

**RESP #75**
**Screen 3.** to be cool and get the best quality
**Screen 4.** cuz i am and this is my job
**Screen 6.** microsoft
**Screen 7.** cuz its the best in the it

**RESP #76**
**Screen 3.** shoot
**Screen 4.** good
**Screen 6.** cool
**Screen 7.** Nice

**RESP #86**
**Screen 3.** its cool
**Screen 4.** because of the quality
**Screen 6.** myself
**Screen 7.** Cool

**RESP #108**
**Screen 3.** shor company

MOTION TO EXCLUDE DECLARATION AND REPORT OF KENNETH A. HOLLANDER

> **RESP #137**
> **Screen 3.** great for dancers
> **Screen 4.** i give up why?
> **Screen 6.** b est answer

(Hollander Dec., Ex. 4.)

These results show very clearly that respondents were given less information than they would actually receive or need in a real purchasing situation.

The issues with the Hollander survey were compounded by the fact that Hollander changed the call of the typical Eveready question, from "Who do you think puts out this brand?" to "**Based just on the information in the screen shot**, who do you think puts out this brand?" In doing so, the Hollander survey essentially asked respondents to merely "parrot" back the ABD brand that they had just been exposed to. Further, it is likely that Mr. Hollander added the preamble, "Based just on the information in the screen shot…" in order to restrict potential responses which might have been based on marketplace knowledge. (Johnson Critique at 15.)

In sum, Hollander's survey failed to provide respondents adequate information to form an opinion regarding the company involved in the survey or enough information to present the respondent the website as presented in the marketplace. Therefore, Hollander's survey should be excluded.

    **4.**  **Hollander's survey population is not clearly defined and is improper.**

The Hollander survey interviewed anyone who described themselves as one of four job titles, Chief Executive Officer, Chief Financial Officer, VP or Director of Human Resources or VP or Director of Risk Management who identify themselves as "mak[ing] purchasing decisions for [their] company's corporate insurance or employee benefits programs" or "influenc[ing] the purchasing decision for [their] company's corporate insurance or employee benefits programs." In reality, Hollander's survey consisted of participants who simply reported that their job titles fell into one of the above groups. Hollander failed to obtain and provide key sample data, including: the type of industry in which participants work, the size of the company in which they work and whether they had recently purchased or currently plan to purchase corporate insurance or employee benefit programs. (Johnson Critique at 7.)

1  Further, the Hollander survey failed to identify the proper universe of respondents. Specifically, in disputes about likelihood of confusion, the appropriate survey universe is the junior user's market.  (McCarthy ¶ 32:159, p. 32-249.)  Thus when designing a likelihood of confusion study, the researcher *ALWAYS* includes a screening question to determine whether the potential participant is a current or prospective purchaser of the product or service at issue.  (Johnson Critique at 7-8.)  The appropriate survey universe in this case is someone who is a current or prospective purchaser of corporate insurance who would be geographically likely to encounter ABD in the actual marketplace, and would, therefore, be expected to have at least some knowledge about providers of such corporate insurance services.

In relation thereto, Hollander's survey is fatally methodologically flawed.  There is no evidence that any of the Hollander survey respondents had shopped for or purchased corporate insurance or employee benefit programs in the recent past or would do so in the near future. Hence, respondents were interviewed without regard for whether or not they would ever encounter either party's services. Additionally, more than half of the survey respondents were located outside of the geographic area covered by Defendants.

Hollander's survey utilized an online methodology in which members of a pre-existing survey panel were solicited to participate in the survey.  Most online panel members volunteer to participate in surveys in exchange for incentives such as points, lottery prizes, etc. By way of example, the survey company utilized by Hollander, Survey Sampling International, advertises for people to become members and "earn cash and other rewards" "each time [they] complete a survey." (Declaration of Felicia Boyd in Support of Motion to Exclude Declaration and Report of Kenneth A. Hollander, Ex. B.)  Given this incentive structure, there is a risk that online participants may not even read the questions they are answering and simply type in quick irrelevant responses to finish the survey and obtain their incentive or reward.  (Johnson Critique at 8.)

These sorts of quick, irrelevant responses plagued the Hollander survey.  As shown by the small sampling above, several respondents simply entered nonsense into the responses in order to complete the survey.

In order to safeguard against this type of acquiescence bias, well-designed online surveys usually incorporate quality control questions to ensure that the respondent is reading and responding to the survey with some care.  (Johnson Critique at 8-9.)  The Hollander Survey has no such quality control questions in place. Hollander also failed to perform any independent validation of his survey results or respondent identities, instead solely relying on the sample provider for this function. (Hollander Dec. at 13.)

Because Hollander's survey did not include the proper universe, did not contain any controls over the participants and took no effort to validate the survey results, Hollander's survey should be excluded.

## IV. CONCLUSION

As discussed by Hollander and above, among other principles, in order to draw reliable conclusions, a survey must have a properly defined universe, contain respondents that represent the proper universe, the survey questions asked should be clear and not leading, and the survey should be conducted so as to ensure objectivity.  Hollander's survey fatally failed in each of these regards and, as such, should be excluded from evidence under rule 702.

Dated:  July 17, 2014                          **BARNES & THORNBURG LLP**

By: *s/Felicia Boyd*
Attorneys for Plaintiffs
WELLS FARGO & COMPANY and WELLS FARGO INSURANCE SERVICES USA, INC.

MIDS01 716312v1