UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WELLS FARGO AND CO., et al.,

          Plaintiffs,                   No. C 12-3856 PJH

         v.                     **ORDER DENYING RENEWED MOTION**
                                          **FOR PRELIMINARY INJUNCTION**
ABD INSURANCE AND FINANCIAL
SERVICES, INC., et al.,

          Defendants.

_____/

On August 6, 2014, plaintiffs' renewed motion for preliminary injunction came on for hearing before this court. Plaintiffs Wells Fargo & Company and Wells Fargo Insurance Services, USA, Inc. ("plaintiffs" or "Wells Fargo") appeared through their counsel, Felicia Boyd. Defendants ABD Insurance and Financial Services, Inc., Kurt DeGrosz, and Brian Hetherington ("defendants" or "the ABD defendants") appeared through their counsel, Benjamin Riley. Having read the parties' papers and carefully considered their arguments, and the relevant legal authority, the court DENIES plaintiffs' motion as follows.

## BACKGROUND

Many of the relevant facts in this case were set out in a previous court order, dated March 8, 2013. See Dkt. 85. To summarize, this suit arises out of the alleged misappropriation of the "ABD" name and trademark by defendants. The "ABD" mark was first used by the company Alburger Basso de Grosz Insurance Services, which was founded in 1990, and which changed its name to "ABD Insurance and Financial Services" in 1997. In 2007, Wells Fargo purchased the company and all of its assets, and in 2008, Wells Fargo merged the newly-bought company into its own insurance company, Wells Fargo Insurance Services.

United States District Court

For the Northern District of California

1   After ABD was purchased by Wells Fargo, a number of former ABD employees

2   (including defendants Hetherington and de Grosz) began working for their own insurance

3   brokerage company, called Insurance Leadership Network ("ILN").  In 2012, after learning

4   that Wells Fargo had changed the legal name of the ABD company that it purchased, ILN

5   filed a federal trademark application for the "ABD" mark and a request with the California

6   Department of Insurance to begin doing business as "ABD Insurance and Financial

7   Services."

8   In July 2012, Wells Fargo learned that defendants had started to promote

9   themselves using the "ABD" name, and sent them a letter demanding that they desist.  In

10  late July 2012, approximately 75 former employees of Wells Fargo Insurance Services

11  joined the new ABD company.

12  Wells Fargo filed this suit on July 24, 2012, asserting five causes of action: (1)

13  violation of section 43(a)(1)(A) of the Lanham Act, (2) violation of section 43(a)(1)(B) of the

14  Lanham Act, (3) common law trademark infringement, (4) violation of Cal. Bus. & Prof.

15  Code section 17200, and (5) false advertising under Cal. Bus. & Prof. Code section 17500.

16  On July 31, 2012, Wells Fargo filed an action in state court against six former employees of

17  Wells Fargo Insurance Services who joined the new ABD company, alleging claims for

18  breach of the duty of loyalty, intentional interference with economic relationships,

19  intentional interference with prospective economic relationships, unfair competition,

20  conspiracy, and breach of contract.  In this suit, Wells Fargo contends that the ABD

21  defendants are creating confusion in the marketplace by using the "ABD" mark, and that

22  they have made false statements regarding the association between defendants' company

23  and the Wells Fargo-purchased ABD company.  In the state court suit, Wells Fargo claims

24  that the ABD defendants have been using the former Wells Fargo employees to solicit

25  Wells Fargo's customers and to use Wells Fargo's proprietary information.

26  Wells Fargo filed its first motion for preliminary injunction on November 30, 2012.

27  On March 8, 2013, the court denied the motion, finding that Wells Fargo had not shown a

28  likelihood of success on the merits of its trademark infringement claim, and that Wells

United States District Court

For the Northern District of California

1  Fargo had not shown that it was likely to suffer irreparable harm absent an injunction.

2  Wells Fargo appealed, and on December 20, 2013, the Ninth Circuit reversed this court's

3  ruling.  Although the Ninth Circuit did not reach the ultimate issues of whether Wells Fargo

4  had established either (1) a likelihood of success on the merits or (2) that it was likely to

5  suffer irreparable harm absent an injunction, the Ninth Circuit did find that this court

6  "abused its discretion in its analysis of Wells Fargo's likelihood of success on the merits of

7  its claims," and remanded the case for reconsideration and further proceedings.  See Wells

8  Fargo v. ABD, 2014 WL 806385 (9th Cir. Mar. 3, 2014).

9      On June 12, 2014, Wells Fargo filed this renewed motion for preliminary injunction.

10  Wells Fargo has also filed a motion to exclude the report of one of defendants' experts

11  (Kenneth A. Hollander), which was submitted as part of defendants' opposition.  Because

12  the motion to exclude presents a threshold evidentiary question, the court will address it

13  first, before deciding the preliminary injunction motion.

**DISCUSSION**

14

15  A.      Motion to Exclude Hollander Report

16          1.      Legal Standard

17      Federal Rule of Evidence 702 permits experts qualified by "knowledge, experience,

18  skill, expertise, training, or education" to testify "in the form of an opinion or otherwise"

19  based on "scientific, technical, or other specialized knowledge" if that knowledge will "assist

20  the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid.

21  702.

22      The proponent of expert testimony bears the burden of establishing by a

23  preponderance of the evidence that the admissibility requirements are met.  See Fed. R.

24  Evid. 702, Advisory Committee Notes.  Although there is a presumption of admissibility,

25  Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 588 (1993), the trial court is obliged to

26  act as a "gatekeeper" with regard to the admission of expert scientific testimony under Rule

27  702.  Id. at 597.

28      Daubert requires a two-part analysis.  First, the court must determine whether an

1  expert's testimony reflects "scientific knowledge," whether the findings are "derived by the

2  scientific method," and whether the work product is "good science" - in other words,

3  whether the testimony is reliable and trustworthy.  Id. at 590 & n.9, 593.  Second, the court

4  must determine whether the testimony is "relevant to the task at hand."  Id. at 597.

5        2.      Legal Analysis

6        In its motion to exclude, Wells Fargo makes four primary challenges to the survey

7  evidence submitted with the Hollander declaration: (1) the survey examines the wrong

8  issue, (2) the use of the Eveready design is improper, (3) the survey test and control stimuli

9  are improper, and (4) the survey population is not clearly defined and is improper.

10        Overall, the court finds merit in a number of Wells Fargo's arguments.  Most

11  importantly, the survey improperly focuses on the likelihood of confusion between the

12  "ABD" brand and the "Wells Fargo" brand, instead of focusing on the likelihood of confusion

13  between the two different uses of the "ABD" mark – one by defendants, and one by the

14  company now owned by Wells Fargo.  The court also finds that defendants have not

15  adequately established that the survey participants were, as claimed, "corporate executives

16  that purchase or have influence over the purchase of corporate insurance or employee

17  benefits plans for their company."  Mr. Hollander appears to have relied on unverified self-

18  reports from the participants regarding their role in purchasing corporate insurance or

19  benefit plans, and given that survey participants were offered certain incentives for

20  participating, the court finds reason to doubt the veracity of those self-reports.

21        That said, the Ninth Circuit has held, on multiple occasions, that "[c]hallenges to

22  survey methodology," including "the format of the questions or the manner in which it was

23  taken, bear on the weight of the evidence, not its admissibility."  See, e.g., Fortune

24  Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt, Inc., 618 F.3d 1025, 1036 (9th Cir.

25  2010); Wendt v. Host Int'l, Inc., 125 F.3d 806, 814 (9th Cir. 1997).  While Wells Fargo

26  correctly identifies a number of problems with the survey, it has not presented any authority

27  supporting its exclusion.  Thus, while the court does find a number of serious deficiencies in

28  the Hollander survey, those deficiencies bear on the weight given to the survey, rather than

4

United States District Court
For the Northern District of California

1  its admissibility.  As a result, the court DENIES Wells Fargo's motion.

2  B.     Motion for Preliminary Injunction

3        1.     Legal Standard

4        A plaintiff seeking a preliminary injunction must establish that it is likely to succeed

5  on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief,

6  that the balance of equities tips in its favor, and that an injunction is in the public interest.

7  Winter v. Natural Resources Defense Council, Inc., 55 U.S. 7, 20 (2008).

8        Alternatively, the plaintiff may demonstrate that serious questions going to the merits

9  were raised and that the balance of hardships tips sharply in the plaintiff's favor, "so long as

10  the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction

11  is in the public interest."  Alliance for Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir.

12  2011).  A "serious question" is one on which the plaintiff has "a fair chance of success on

13  the merits."  Sierra On-Line, Inc. v. Phoenix Software, Inc., 739 F.2d 1415, 1421 (9th Cir.

14  1984).

15        An injunction is a matter of equitable discretion and is "an extraordinary remedy that

16  may only be awarded upon a clear showing that the plaintiff is entitled to such relief."

17  Winter, 55 U.S. at 22.

18        2.     Legal Analysis

19        As mentioned above, in denying Wells Fargo's original motion for preliminary

20  injunction, this court found that Wells Fargo had failed to satisfy two prongs of the Winter

21  test:  (1) likelihood of success on the merits, and (2) irreparable harm.  The Ninth Circuit, in

22  reversing this court, concluded that "the district court abused its discretion in its analysis of

23  Wells Fargo's likelihood of success on the merits of its claims," but "decline[d] to address"

24  the irreparable harm issue, instead directing this court to "revisit the issue of irreparable

25  harm on remand" in light of the recent decision in Herb Reed Enterprises, LLC v. Florida

26  Entertainment Management, Inc., 736 F.3d 1239 (9th Cir. 2013).

27

28

5

United States District Court

For the Northern District of California

1              a.     Likelihood of success on the merits

2          In reversing this court on the "likelihood of success on the merits" analysis, the Ninth

3    Circuit made three findings.  First, it rejected this court's characterization of Wells Fargo's

4    false advertising claim as "derivative" of its trademark infringement claim, and held that this

5    court abused its discretion by failing to separately consider the false advertising claim.

6          Second, the Ninth Circuit rejected this court's conclusion that defendants had "made

7    a sufficient showing of a likelihood of success on the merits of their abandonment defense

8    to preclude a finding that Wells Fargo is likely to succeed" on its trademark infringement

9    claim, and instead concluded that "Wells Fargo continued its bona fide use of the mark in

10   the ordinary course of business."

11         Finally, the Ninth Circuit rejected this court's apparent reliance on the lack of

12   evidence of actual confusion, holding that actual confusion "is less important at the

13   preliminary injunction stage" of the case, because "at that point parties have rarely

14   amassed significant evidence of actual confusion."

15         Notably, the Ninth Circuit did not affirmatively hold that Wells Fargo had established

16   a likelihood of success on the merits.  Thus, the court will reconsider the issue, in light of

17   the Ninth Circuit's guidance and the new evidence cited by the parties in this renewed

18   motion.

19         Wells Fargo argues that it is likely to succeed on the merits on three[1] of its claims:

20   (1) trademark infringement, (2) false affiliation, and (3) false advertising.

21          In order to prevail on its claim for trademark infringement, Wells Fargo must show

22   that (1) it owns a valid trademark and (2) defendants' use of the mark is likely to cause

23   confusion, mistake, or deception.  See, e.g., Applied Information Sciences Corp. v. eBay,

24   Inc., 511 F.3d 966, 969 (9th Cir. 2007).

25         As to the first prong, the court finds that Wells Fargo's acquisition of ABD Insurance

26

27   ───────────────────────

28        [1]The court notes that Wells Fargo needs to show a likelihood of success on the merits of only one of its claims in order to meet the first prong of the Winter test.

6

1  & Financial Services in 2007 included the acquisition of the "ABD" trademark.  Defendants

2  do not challenge the validity of this initial acquisition, but instead, argue that Wells Fargo

3  has since abandoned the mark.

4          In order to establish a defense of trademark abandonment, an accused infringer

5  must show that the trademark owner (1) discontinued use of the mark, (2) with intent not to

6  resume such use.  Electro Source, LLC v. Brandess-Kalt-Aetna Group, Inc., 458 F.3d 931,

7  935 (9th Cir. 2006).  In its previous order denying Wells Fargo's motion for preliminary

8  injunction, the court considered the facts presented by defendants – including Wells

9  Fargo's merging of the ABD company into Wells Fargo Insurance Services, its instructions

10 that "the ABD name can no longer be used," and its failure to maintain the "ABD" trade

11 name with the California Department of Insurance, among other things – and while it did

12 "not rule on the ultimate issue of whether Wells Fargo actually abandoned the 'ABD' mark,"

13 it did "find that defendants have made a sufficient showing of a likelihood of success on the

14 merits of their abandonment defense to preclude a finding that Wells Fargo is likely to

15 succeed" on its trademark infringement claim.  Dkt. 85 at 14.

16         However, on appeal, the Ninth Circuit "conclude[d] that Wells Fargo continued its

17 bona fide use of the mark in the ordinary course of business," "most notably in customer

18 presentations and solicitations."  In so holding, the Ninth Circuit essentially made a finding

19 of fact regarding Wells Fargo's use of the mark.  And because even a "single instance of

20 use is sufficient against a claim of abandonment of a mark if such use is made in good

21 faith," the Ninth Circuit's finding effectively precludes defendants' abandonment defense.

22         Defendants now argue that the Ninth Circuit's conclusion was merely "non-binding

23 dictum," and urges the court to "review the new record presented with this motion, and

24 make an independent determination on the abandonment issue."  However, there are two

25 problems with defendants' argument.  First, the nature of the abandonment defense is that

26 it requires the trademark holder to make no bona fide use of the mark, and even a "single

27 instance of use" is sufficient to defeat the defense.  Thus, once there has been a finding

28 that such a use occurred, no amount of contrary evidence can undo that finding.  Second,

1  defendants admit that Wells Fargo relies "principally on the same factual record" as the

2  previous motion, and they argue that Wells Fargo's "only new 'evidence' consists of an

3  outdated and false ad, an illegal reference to the old firm, and another reference to the fact

4  that Wells Fargo acquired ABD in 2007."  Thus, there is not much of a "new" record for the

5  court to review.  Based on the Ninth Circuit's finding that Wells Fargo "continued its bona

6  fide use of the mark," the court must hold that defendants have not shown a likelihood of

7  success on the merits of their abandonment defense, and that Wells Fargo has made a

8  sufficient showing that it owns a valid trademark.

9      The second element of an infringement claim requires a trademark owner to show

10  that defendants' use of the mark is likely to cause confusion, mistake, or deception.  This

11  analysis is guided by the eight factors set forth in AMF v. Sleekcraft Boats.  599 F.2d 341

12  (9th Cir. 1979).  The Sleekcraft factors are:

13      (1) strength of the mark;

14      (2) proximity of the goods;

15      (3) similarity of the marks;

16      (4) evidence of actual confusion;

17      (5) marketing channels used;

18      (6) type of goods and the degree of care likely to be exercised by the purchaser;

19      (7) defendant's intent in selecting the mark;

20      (8) likelihood of expansion of the product lines.

21  Id. at 348-49.

22      In its previous order, the court found that the parties' arguments were largely

23  focused on factors (4), (6), and (7).  However, in opposing Wells Fargo's renewed motion,

24  defendants challenge more than just those three factors, so the court will address all of the

25  Sleekcraft factors in this order.

26      As to the strength of the mark, the court notes that this factor is "evaluated in terms

27  of its conceptual strength and commercial strength."  GoTo.com, Inc. v. Walt Disney Co.,

28  202 F.3d 1199, 1207 (9th Cir. 2000).  Conceptual strength is measured "along a spectrum

United States District Court

For the Northern District of California

of increasing inherent distinctiveness," and marks are categorized, from weakest to strongest, as "generic, descriptive, suggestive, and arbitrary or fanciful." Id.  The court finds that the "ABD" mark falls into the "arbitrary or fanciful" category, and thus finds the mark to be conceptually strong.  As to commercial strength, the court notes that the ABD defendants described the mark as having "a ton of brand equity," and while the court agrees that Wells Fargo did very little to maintain the mark's strength (by failing to promote the brand, and by merging the ABD company into Wells Fargo Insurance Services), that non-maintenance of the mark did not completely deteriorate its commercial strength.  As a result, the court finds that factor (1) favors Wells Fargo.

As to the proximity of the goods, defendants do not appear to dispute that the companies offer identical insurance brokerage services, so the court finds that factor (2) favors Wells Fargo.

As to the similarity of the marks, defendants argue that the relevant comparison is between Wells Fargo's mark and the ABD defendants' mark.  The court disagrees, and finds that the relevant comparison is between the mark of the ABD company purchased by Wells Fargo, and the mark used by the ABD defendants.  The court finds that the marks are indeed similar, and thus, factor (3) favors Wells Fargo.

As to the evidence of actual confusion, the court found in its previous order that "outside of the period immediately following ABD's launch, Wells Fargo has failed to show any examples of confusion among the consumers of the insurance products both companies provide."  Dkt. 85 at 15.  Wells Fargo now offers one new instance of alleged actual confusion – a March 8, 2014 email to defendants from a "potential client" asking "I am curious – are you part of the old ABD that merged with Wells or Woodruf – I can't remember and then exited[?]"  Dkt. 124 at 18.  In their opposition brief, defendants argue that the March 2014 email was actually from "an accounting consultant (not a client)."  Wells Fargo does not mention the March 2014 email in its reply, instead pointing to a different example of "ongoing" confusion that occurred in June 2014, when "an insurer providing the workers' compensation coverage for one of Wells Fargo's accounts refused to

United States District Court

For the Northern District of California

1    provide loss information to Wells Fargo because the insurer's records listed ABD as the

2    broker of record."  Dkt. 146 at 9.  This latest example may be evidence of confusion, but

3    not of <u>consumer</u> confusion.[2]  Thus, it appears that Wells Fargo still is unable to identify any

4    examples of consumer confusion that occurred outside of the period immediately following

5    ABD's launch.

6         The court acknowledges that "a motion for preliminary injunction normally occurs

7    early in litigation," and "at that point parties rarely have amassed significant evidence of

8    actual confusion."  <u>Wells Fargo v. ABD</u>, 2014 WL 806385, at *3.  However, this case is

9    atypical in certain respects, including that the case has been pending for over two years,

10   and that Wells Fargo has issued subpoenas to over 150 of the ABD defendants' clients,

11   resulting in over 28,000 documents produced through discovery.  Thus, Wells Fargo has

12   had ample opportunity to find examples of consumer confusion.  Given that all examples of

13   consumer confusion occurred in July and August of 2012, and that defendants have taken

14   measures to remedy any such confusion, the court finds that factor (4) favors defendants.[3]

15   That said, actual confusion is but one of the <u>Sleekcraft</u> factors, and the court's finding

16   regarding factor (4) does not automatically preclude Wells Fargo from showing a likelihood

17   of confusion, and thus a likelihood of success on the merits of its trademark infringement

18   claim.

19        As to the marketing channels used, defendants do not appear to dispute that the

20   parties use similar marketing channels, and instead argue that the court should give

21

22   _____

23        [2]Wells Fargo attempts to argue that its clients' insurance carriers are also "customers"
     of Wells Fargo, referring to them as "upstream customers."  However, Wells Fargo has not
     adequately explained how insurance carriers are in any sense "customers" of Wells Fargo.
24   Indeed, to the extent that Wells Fargo alleges that it lost business due to defendants' activities,
     those allegations appear to center around purchasers of insurance (i.e., "downstream"
25   customers).  Thus, in the absence of an adequate explanation as to the relationship between
     Wells Fargo and insurance carriers, the court will consider only those entities which purchase
26   insurance from Wells Fargo to be Wells Fargo's "customers."

27        [3]Given the serious deficiencies in the Hollander survey (described above), the court
     affords the survey very little weight, and instead bases its conclusion on the lack of evidence
28   of actual confusion submitted by Wells Fargo.

United States District Court
For the Northern District of California

"minimal weight" to this factor "[d]ue to the related goods involved here."  However, the authority cited by defendants does not support their argument – in <u>Playboy Enterprises, Inc. v. Netscape Communications Corp.</u>, the court gave "little weight" to this factor only because both parties used the Internet as a marketing channel, and that "[g]iven the broad use of the Internet today, the same could be said for countless companies."  354 F.3d 1020, 1028 (9th Cir. 2004).  The mere fact that the parties' products are similar does not require giving less weight to this, or any other, factor.  Accordingly, the court finds that factor (5) favors Wells Fargo.

As to the type of goods and the degree of care likely to be exercised by the purchaser, the court previously held, and still holds, that "[i]nsurance brokerage is not an industry where customers make purchases on a whim, and can be easily fooled by the name of a company."  Dkt. 85 at 16.  The evidence shows that defendants' customers are highly sophisticated, and made purchasing decisions based on their relationships with individual brokers, not based solely on the name "ABD."  In its previous order, the court cited a customer email exhibiting the level of sophistication exercised.  <u>See id.</u>  After the Wells Fargo customer (Lori McAdams, Vice President of Human Resources and Administration at Pixar) learned that a Wells Fargo broker (Chris Call) left to join a new company, she sent an unsolicited email to Mr. Call's personal email address, explaining that she had learned of his departure and would "love to talk with [him] to hear about the new organization" and his "interest in remaining a consultant to Pixar."  <u>See</u> Dkt. 142, Ex. A.  Ms. McAdams noted that "Wells Fargo is anxious to keep our business," but made clear that Pixar "value[d]" Mr. Call and another broker (who also left Wells Fargo to join the new ABD company) "much more as individuals than as Wells Fargo employees."  <u>Id.</u>  Ms. McAdams also explained that she had conducted a call with "WF leadership" that morning, and was "not impressed and definitely want[ed] to explore what to do and determine what's in the best interest of our Plans."  <u>Id.</u>

Defendants also provide declarations from two customers who moved their business from Wells Fargo to the new ABD company.  <u>See</u> Dkts. 140-12 (declaration of Timothy E.

1   Morris); 140-13 (declaration of William Reed Sawyers).  Mr. Morris explains that, after

2   learning that his "primary contacts" at Wells Fargo (Jeff Dodds and his team) left to join the

3   new ABD company, he "decided to keep the account with Mr. Dodds and his team, even

4   though at that time [he] was unaware of the name of the new company," because he

5   "trusted the expertise and knowledge of Mr. Dodds and his team in servicing [their]

6   account, and viewed that long-standing relationship as the decisive factor."  Dkt. 140-12 at

7   ¶ 3.  Mr. Sawyers similarly explains that his decision to move his business from Wells

8   Fargo to the new ABD company "was not a difficult one, given that the primary individuals

9   servicing the [] account had departed" Wells Fargo.  Dkt. 140-13 at ¶ 4.  Mr. Sawyers also

10  makes clear that "[a]t no point in the process was [he] confused by the 'ABD' name, nor did

11  [he] think that the ABD team had any association" with Wells Fargo or the Wells Fargo-

12  acquired ABD company.  Id., ¶ 5.

13      In short, the court finds no reason to modify its original finding regarding factor (6),

14  and thus, factor (6) favors defendants.

15      As to defendants' intent in selecting the mark, the court previously rejected

16  defendants' argument that they chose the "ABD" mark simply to "honor their fathers and

17  their legacies," and instead found that they "chose the mark to signal some sort of link with

18  the original ABD company."  Dkt. 85 at 16-17.  The court's previous finding applies with

19  equal force on this motion, and thus, factor (7) favors Wells Fargo.

20      Finally, as to the likelihood of expansion of the product lines, Wells Fargo argues

21  that this factor is of "diminished importance here but still weighs strongly in Wells Fargo's

22  favor because the marks are identical and defendants have already expanded to unfairly

23  compete against Wells Fargo in virtually [every] type of insurance brokerage market."  Dkt.

24  124 at 23.  However, the similarity of the marks was already considered as part of factor

25  (2), and the argument that defendants have already expanded does not speak to the

26  "likelihood of expansion."  In short, it appears that factor (8) was designed to apply to

27  circumstances where an alleged infringer did not yet compete with a trademark holder, but

28  was likely to do so.  That is not the case here, so the court finds that factor (8) is neutral.

United States District Court

For the Northern District of California

1    Having considered the Sleekcraft factors, the court finds that factors (1), (2), (3), (5),

2    and (7) favor Wells Fargo; factors (4) and (6) favor defendants; and factor (8) is neutral.

3    However, the factors are not to be given equal weight, and instead "must be applied in a

4    flexible fashion." Rearden LLC v. Rearden Commerce, Inc., 683 F3d 1190, 1209 (9th Cir.

5    2012). Overall, while the lack of actual confusion and the high degree of care exercised by

6    purchasers do lessen the likelihood of confusion, the court finds that the fact that the marks

7    and the goods are identical – not just similar – combined with defendants' intent in selecting

8    the mark, tip the balance towards Wells Fargo. Thus, the court finds that Wells Fargo has

9    shown a likelihood of confusion, and coupled with the Ninth Circuit's finding regarding Wells

10    Fargo's bona fide use of the "ABD" mark (which defeats defendants' abandonment

11    defense), the court finds that Wells Fargo has shown a likelihood of success on the merits

12    of its trademark infringement claim.

13    Given that a plaintiff seeking a preliminary injunction need only show a likelihood of

14    success on the merits of one of its claims, the court need not address at length the merits

15    of Wells Fargo's false affiliation claim or false advertising claim. A false affiliation claim

16    under section 43(a)(1)(A) of the Lanham Act prohibits the use of any name, word, or term

17    that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation,

18    connection, or association" between two providers of goods or services. See 15 U.S.C.

19    § 1125(a)(1)(A). Thus, it is similar to a trademark infringement claim, but does not require

20    proof of a valid trademark. Because the "likelihood of confusion" analysis for false affiliation

21    purposes would be similar to the analysis for trademark infringement purposes, the court

22    finds that Wells Fargo has shown a likelihood of success on the merits of its false affiliation

23    claim.

24    To establish a false advertising claim, Wells Fargo needs to show that (1)

25    defendants made one or more false statements of fact in a commercial advertisement

26    about their own or Wells Fargo's services, (2) the statement(s) actually deceived or has (or

27    have) the tendency to deceive a substantial segment of its audience, (3) the deception is

28    material, in that it is likely to influence the purchasing decision, (4) defendants caused their

United States District Court

For the Northern District of California

1   false statement(s) to enter interstate commerce, and (5) Wells Fargo has been or is likely

2   to be injured as a result of the false statement(s), either by direct diversion of sales from

3   itself to defendants or by a lessening of the goodwill associated with its products. See,

4   e.g., Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997).

5          Here, the analysis differs from the analysis of the trademark infringement claim.  As

6   to prong (1), the court will assume that defendants' statements regarding the "relaunch" of

7   ABD were false statements of fact.  As to prong (2), as discussed above, the court has not

8   found any examples of actual deception, which is distinct from mere confusion.  However,

9   because the court has found a likelihood of confusion as to defendants' use of the "ABD"

10  name, it does find that defendants' statements had "a tendency to deceive."  However, as

11  to prong (3), Wells Fargo has presented no evidence that defendants' alleged deception

12  was "material, in that it is likely to influence the purchasing decision."  As discussed above,

13  insurance brokerage customers are sophisticated purchasers, and the evidence cited

14  above indicates that their purchasing decisions were governed by their relationships with

15  individual brokers, rather than by any alleged deception.  Thus, the court finds that Wells

16  Fargo has not shown a likelihood of success on the merits of its false advertising claim.

17  However, because it has already shown that it is likely to succeed on its other two claims,

18  the first prong of the Winter test is indeed met.

19                  b.   Irreparable harm

20          As mentioned above, the Ninth Circuit did not address the issue of irreparable harm,

21  instead noting that "neither the district court nor the parties had the benefit" of the recent

22  decision in Herb Reed Enterprises, LLC v. Florida Entertainment Management, Inc., and

23  directing this court to "revisit the issue of irreparable harm on remand."  The Ninth Circuit

24  also quoted a relevant passage from Herb Reed, holding that "[e]vidence of loss of control

25  over business reputation and damage to goodwill could constitute irreparable harm."  736

26  F.3d at 1250.  The court begins with a close examination of the Herb Reed decision.

27          The factual record in Herb Reed was a complicated one (due to a large number of

28  prior lawsuits with conflicting results), but essentially, the trademark dispute centered

14

United States District Court

For the Northern District of California

1    around the use of the name "The Platters" by former members of the vocal group and by

2    other claimants to the name.  Herb Reed, one of the founding members of the group,

3    sought (through his company, Herb Reed Enterprises) a preliminary injunction against one

4    of those other claimants to the name.  The district court granted the preliminary injunction

5    motion, concluding that the damage to Reed's reputation constituted irreparable harm and

6    warranted an injunction.

7        On appeal, the Ninth Circuit started by discussing the standard for showing

8    irreparable harm, noting that the Supreme Court had "cast doubt on the validity of the

9    [Ninth Circuit's] previous rule that the likelihood of 'irreparable injury' may be presumed

10   from a showing of likelihood of success on the merits of a trademark infringement claim."

11   736 F.3d at 1248-49 (emphasis in original).  In Winter and in eBay v. MercExchange, the

12   Supreme Court found that such a presumption was improper, and that a plaintiff needed to

13   show an actual likelihood of irreparable injury (not just a "possibility").  See 736 F.3d at

14   1249 (citing Winter, 555 U.S. at 22; eBay, 547 U.S. 388, 391 (2006)).  The Ninth Circuit

15   had previously adopted that rationale in the copyright context, but the Herb Reed court

16   expressly extended it to a preliminary injunction motion in a trademark case.  Specifically,

17   Herb Reed held that the Ninth Circuit "now join[ed] other circuits in holding that the eBay

18   principle – that a plaintiff must establish irreparable harm – applies to a preliminary

19   injunction in a trademark infringement case."  736 F.3d at 1249.

20       Applying the rule of Winter and eBay, the Herb Reed court found that the district

21   court improperly relied on "unsupported and conclusory statements regarding harm" in

22   granting the injunction, and that its analysis was "cursory and conclusory, rather than being

23   grounded in any evidence or showing offered by" Herb Reed.  736 F.3d at 1250.  The court

24   acknowledged that "evidence of loss of control over business reputation and damage to

25   goodwill could constitute irreparable harm" (as quoted above), but it went on to hold that

26   the district court's "pronouncements are grounded in platitudes rather than evidence, and

27   relate neither to whether 'irreparable injury' is likely in the absence of an injunction," nor to

28   "whether legal remedies, such as money damages, are inadequate in this case."  Id. at

15

United States District Court

For the Northern District of California

1250 (emphasis in original).  The court clarified that "it may be that [Herb Reed] could

establish the likelihood of irreparable harm," but "missing from this record is any such

evidence." Id.

The closest evidence of irreparable harm that the Herb Reed court found was "an

email from a potential customer complaining to [defendant's] booking agent that the

customer wanted Herb Reed's band rather than another tribute band."  736 F.3d at 1250.

But the Ninth Circuit found that such evidence "simply underscores customer confusion, not

irreparable harm." Id.

Applying the holding of Herb Reed to the present case, the court finds that Wells

Fargo's arguments regarding harm to reputation and goodwill are the same type of

"unsupported and conclusory statements regarding harm [plaintiff] might suffer" that were

rejected in Herb Reed.  For instance, Wells Fargo argues in its opening motion that ABD

has "caused Wells Fargo to lose control over [its] goodwill and reputation," that it "has lost

and continues to lose much of the goodwill it purchased," and has "lost the benefit of the

association it forged with the ABD name." See Dkt. 124 at 20, 27.  These statements are

mere assertions, and, as was the case in Herb Reed, they are "platitudes rather than

evidence."

In its reply, Wells Fargo argues that the declaration of Krista Holt contains

"uncontroverted expert testimony on the nature of the harm and the absence of monetary

damages sufficient to repair the harm," and when asked about irreparable harm at the

hearing, counsel for Wells Fargo again pointed to the Holt declaration as containing

"evidence . . . with respect to the damage that is being done to our brand." See Dkt. 146 at

15; Dkt. 158 at 29.  At the hearing, the court asked Wells Fargo's counsel to "go through

the Holt declaration, and tell me what evidence she refers to that establishes the harm to

the brand."

Wells Fargo's counsel directed the court's attention to section 6 of the Holt

declaration, entitled "irreparable harm," and started with paragraph 36, which stated that "it

would be difficult to fully capture the amount of economic damages caused by the

16

United States District Court

For the Northern District of California

1    defendants in this case." See Dkt. 126, ¶ 36.

2        Wells Fargo's counsel then pointed to the remainder of the Holt declaration's

3    "irreparable harm" section, paragraphs 37 through 40.  Paragraph 37 states that "[t]he ABD

4    brand is valuable because it signals to existing and prospective clients that the underlying

5    firm is stable, trustworthy and provides quality service," and that "[b]y attempting to subvert

6    the ABD brand for its own purposes, the defendants are diminishing the value that this

7    brand conveys to Wells Fargo."  Dkt. 126, ¶ 37.

8        Paragraph 38 discusses Wells Fargo's acquisition of the ABD brand, and states that

9    "[t]he association Wells Fargo forged with this valuable mark has been undermined by the

10   existence of a competing company with the same name and will likely cause severe and

11   irreversible damage to the consumer perception of the ABD mark and, by extension, to

12   Wells Fargo."  Dkt. 126, ¶ 38.

13       Paragraph 39 explains that "defendants opened their doors in July 2012 under the

14   ABD name" and "began advertising themselves as a reincarnation of the former ABD,"

15   which "devalues the Wells Fargo ABD mark and makes it seem inauthentic."  Dkt. 126,

16   ¶ 39.

17       Paragraph 40 argues that defendants' use of the ABD name "does not just attempt

18   to associate the defendants with the valuable ABD brand, but taints Wells Fargo's

19   association with the mark."  Dkt. 126, ¶ 40.  Ms. Holt argues that, "[t]hrough promoting itself

20   as the 'authentic' ABD, the defendants have disassociated the mark from its rightful owner,

21   which directly diminishes the trademark's value to Wells Fargo."  Id.

22       The court also notes that paragraph 55 of the Holt declaration asserts that

23   "defendants weakened the association of the [ABD] mark to Wells Fargo, diminishing the

24   value of the brand and making it less instructive to potential clients who rely on Wells

25   Fargo's reputation for quality service."  Dkt. 126, ¶ 55.

26       As a threshold matter, defendants argue that the court should "disregard Ms. Holt's

27   declaration" because her "opinions are inadmissible legal conclusions."  While the court will

28   not disregard the declaration entirely, it does note that "an expert witness cannot give an

United States District Court
For the Northern District of California

1   opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law." <u>Nationwide</u>

2   <u>Transport Finance v. Cass Information Systems, Inc.</u>, 523 F.3d 1051, 1058 (9th Cir. 2008).

3   Thus, to the extent that Ms. Holt attempts to opine on the ultimate issue of whether Wells

4   Fargo has suffered or is likely to suffer irreparable harm (such as her assertions that Wells

5   Fargo is suffering "irreversible" harm and that any harm "cannot be fully remedied through

6   monetary damages"), the court finds those statements inadmissible.

7          The remainder of Ms. Holt's statements regarding the harm to Wells Fargo's brand,

8   reputation, and goodwill – while not inadmissible – are the type of "unsupported and

9   conclusory statements regarding harm" that were rejected in <u>Herb Reed</u>.  Ms. Holt simply

10  asserts, without any supporting evidence, that defendants' actions have "diminished,"

11  "undermined," "devalue[d]," and "taint[ed]" Wells Fargo's association with the ABD brand.

12  In order to establish harm to its reputation or its goodwill, Wells Fargo must do more than

13  simply submit a declaration insisting that its reputation and goodwill have been harmed.

14  Ms. Holt's assertions would apply in any case where a trademark holder had established a

15  likelihood of success on a claim of infringement, and thus, do not constitute the type of

16  evidence required by <u>Herb Reed</u>.  <u>See</u> 736 F.3d at 1251 ("Those seeking injunctive relief

17  must proffer <u>evidence</u> sufficient to establish a likelihood of irreparable harm.") (emphasis

18  added).  The <u>Herb Reed</u> court acknowledged that it may be difficult for parties to obtain

19  such evidence at the preliminary injunction stage of the case, which is why it made clear

20  that "the rules of evidence do not apply strictly to preliminary injunction proceedings." <u>Id.</u> at

21  1250, n.5.  However, even under this relaxed evidentiary burden, Wells Fargo offers no

22  evidence of any harm to its reputation, brand, or goodwill, and instead offers only

23  "platitudes" of the type rejected in <u>Herb Reed</u>.

24         In <u>Herb Reed</u>, the Ninth Circuit specifically rejected the "presumption of irreparable

25  harm based solely on a strong case of trademark infringement." 736 F.3d at 1250.  As

26  stated by the court, "[g]one are the days when 'once the plaintiff in an infringement action

27  has established a likelihood of confusion, it is ordinarily presumed that the plaintiff will

28  suffer irreparable harm if injunctive relief does not issue.'" <u>Id.</u> (internal citations omitted).  If

United States District Court
For the Northern District of California

1  the court were to accept Wells Fargo's conclusory assertions of harm to its reputation and

2  goodwill, it would effectively re-insert that now-rejected presumption of irreparable harm.  A

3  plaintiff in a trademark infringement case cannot obtain an injunction simply by showing a

4  likelihood of success on the merits of its claim, and then asserting (without evidence) that

5  the alleged infringement "devalues" and "taints" the mark.  If the court were to find

6  irreparable harm based on those conclusory assertions, it would "collapse[] the likelihood of

7  success and the irreparable harm factors," and would have the practical effect of re-

8  inserting the presumption of irreparable harm that was rejected in Herb Reed.  Id. at 1251.

9      Wells Fargo insists in its papers that it does not seek an "automatic" finding of

10  irreparable harm, but its counsel made statements at the preliminary injunction hearing that

11  indicate otherwise.  At the hearing, the court noted that any trademark infringement plaintiff

12  could argue that, when an alleged infringer was using its mark, that the trademark holder

13  had "lost control" of the mark.  Thus, the court asked Wells Fargo's counsel: "Is proof of

14  loss of control sufficient to establish damage to the goodwill?," to which counsel answered

15  "yes."  Dkt. 158 at 28.  In the court's view, Herb Reed requires more than just proof of loss

16  of control, which would be present in every case where a trademark holder had established

17  a likelihood of success on the merits of an infringement claim.  Instead, Herb Reed requires

18  evidence that the loss of control is likely to cause harm to the trademark holder.  In this

19  case, as in Herb Reed, the court finds that it may be the case that Wells Fargo "could

20  establish the likelihood of irreparable harm," but "missing from this record is any such

21  evidence."

22      Thus, while "evidence of loss of control over business reputation and damage to

23  goodwill could constitute irreparable harm," Wells Fargo (like the Herb Reed plaintiff) has

24  failed to provide any such evidence in this case; and thus, the court finds that Wells Fargo

25  has not established a likelihood of irreparable harm as to its brand, reputation, and/or

26  goodwill.

27      In addition to the arguments regarding alleged harm to Wells Fargo's brand,

28  reputation, and goodwill, Wells Fargo also argues that defendants' actions have caused it

United States District Court
For the Northern District of California

1   to lose business – specifically, Wells Fargo alleges that it has lost "scores of customers

2   representing millions of dollars in lost revenue," and "stands to lose even more customers

3   who are confused or are under the wrong impression that defendants are legitimately

4   continuing the original ABD business and are authorized to use the ABD name." Dkt. 124

5   at 28; <u>see also</u> Dkt. 126, ¶¶ 45-58.  However, while Wells Fargo has shown that it has lost

6   business, it has not shown any connection between that lost business and defendants' use

7   of the "ABD" name.  In fact, all of the evidence before the court supports its earlier finding

8   that "it seems equally (if not more) likely that Wells Fargo's lost business was the result of

9   each customer's informed choice about whether to do business with Wells Fargo or ABD."

10  <u>See</u> Dkt. 85 at 16; <u>see also</u> Dkt. 85 at 17 ("Wells Fargo has not established a nexus

11  between defendants' alleged infringement and any harm suffered by Wells Fargo.").

12          First, defendants submit an email from Lori McAdams, Vice President of Human

13  Resources and Administration at Pixar, who is now doing business with the new ABD

14  company.  <u>See</u> Dkt. 142, Ex. A.  After Ms. McAdams learned that a Wells Fargo broker

15  (Chris Call) had left to join another company, she sent an unsolicited email to his personal

16  email address, explaining that she and other Pixar employee "had learned this morning"

17  that Mr. Call and another broker had left Wells Fargo, and that she would "love to talk with

18  [him] to hear about the new organization" and his "interest in remaining a consultant to

19  Pixar." <u>Id.</u>  Ms. McAdams noted that "Wells Fargo is anxious to keep our business," but

20  made clear that Pixar "value[d]" Mr. Call and his colleague "much more as individuals than

21  as Wells Fargo employees." <u>Id.</u>  Ms. McAdams also explained that she had conducted a

22  call with "WF leadership" that morning, and was "not impressed and definitely want[ed] to

23  explore what to do and determine what's in the best interest of our Plans." <u>Id.</u>  The email

24  from Ms. McAdams makes clear that Pixar's choice to do business with ABD was not the

25  result of the use of the "ABD" name, or any mistaken association with Wells Fargo or the

26  Wells Fargo-acquired ABD company.  In fact, Ms. McAdams appears to have had no

27  knowledge of the name of the company that Mr. Call was working for.

28          Second, defendants provide a declaration from Timothy E. Morris, Senior Vice

United States District Court

For the Northern District of California

1   President of Global Corporate Development and Chief Financial Officer at Vivius, a current

2   client of the ABD defendants and former client of Wells Fargo.  See Dkt. 140-12.  Mr.

3   Morris explains that his primary contacts at Wells Fargo were Jeff Dodds and his team.  In

4   July 2012, Mr. Morris learned that "Mr. Dodds and core members of his team had left Wells

5   Fargo to work for a new company."  Id., ¶ 3.  Mr. Morris "decided to keep the account with

6   Mr. Dodds and his team, even though at that time [he] was unaware of the name of the

7   new company," because he "trusted the expertise and knowledge of Mr. Dodds and his

8   team," and "viewed that long-standing relationship as the decisive factor."  Id.  Mr. Morris

9   then makes clear that "[a]t no point in the process was [he] confused by the 'ABD' name,

10  nor did [he] think that the ABD team had any affiliation with Wells Fargo" or the Wells

11  Fargo-acquired ABD company.  Id., ¶ 4.

12      Third, defendants provide a declaration from William Reed Sawyers, Executive Vice

13  President, Chief Administrative Officer, and General Counsel for the Ernest Gallo Clinic and

14  Research Center, a current client of the ABD defendants and former client of Wells Fargo.

15  See Dkt. 140-13.  Mr. Sawyers explains that Nicole White and Eric Long were his primary

16  contacts at Wells Fargo, and that, in July 2012, he received a call from Mr. Long informing

17  him of his departure from Wells Fargo.  Id., ¶ 2.  Mr. Sawyers says that his "decision to

18  switch the Gallo account to the ABD team was not a difficult one, given that the primary

19  individuals servicing the Gallo account had departed" Wells Fargo, and because those

20  individuals "all had the necessary expertise, knowledge, and experience to continue

21  supporting the Gallo insurance brokerage account."  Id., ¶ 4.  Mr. Sawyers also makes

22  clear that "[a]t no point in the process was [he] confused by the 'ABD' name, nor did [he]

23  think that the ABD team had any affiliation with Wells Fargo" or the Wells Fargo-acquired

24  ABD company.  Id., ¶ 5.

25      Fourth, defendants submit an email exchange between employees at Meltwater, a

26  current client of the ABD defendants and former client of Wells Fargo.  After an ABD

27  employee sent the Meltwater employees the outline of a proposal, the Meltwater

28  employees had an internal discussion about whether to make the switch from Wells Fargo

21

United States District Court

For the Northern District of California

to ABD.  See Dkt. 141, Ex. 48.  Laurie Dahlgren at Meltwater responded as follows: "It's my view that the team is more important than the company, and I do know that Wells Fargo Insurance closed down a local office which impacted many people.  Sounds like the team that has been servicing Meltwater has joined the company Megan is recommending switching to (ABD)."  Id.  Ms. Dahlgren then noted that it was "disturbing" that "Wells Fargo hasn't been in touch to introduce their new team that will be handling Meltwater's benefits/relationship."  Id.  This email exchange does not support the conclusion that the loss of Meltwater's business was the result of defendants' use of the "ABD" name, or of any mistaken association with Wells Fargo or the Wells Fargo-acquired ABD company.

To be clear, the evidence provided by defendants is not dispositive on the irreparable harm issue.  If Wells Fargo were able to provide even one example of a customer who did switch (or is likely to switch) from Wells Fargo to defendants' company based on defendants' use of the "ABD" name, or based on a mistaken association with Wells Fargo, that would be enough to establish harm, even if defendants provided many more examples of customers who switched as the result of an informed choice.  However, Wells Fargo has presented no such evidence, even though it issued subpoenas to over 150 of defendants' customers, seeking "documents which evidence false communications and trademark infringement used to solicit business away from Wells Fargo," which it argued were "necessary to fully ascertain the harm caused to Wells Fargo" and to meet its burden of establishing irreparable harm on its preliminary injunction motion.  See Dkt. 53 at 9.  Wells Fargo's subpoenas ultimately resulted in over 28,000 documents produced by the ABD defendants' clients.

At the preliminary injunction hearing, the court asked Wells Fargo's counsel: "Do you have any example of a company that moved its insurance business to ABD because of its mistaken assumption that Team ABD was the same thing as Wells Fargo's ABD?", to which counsel responded: "I don't have that with me today, Your Honor, no.  We're not in the damages portion of this case."  See Dkt. 158 at 32.  Wells Fargo's counsel misconstrues its evidentiary burden at this stage of the case.  While Wells Fargo need not

United States District Court
For the Northern District of California

1    yet identify <u>every</u> example of lost business resulting from defendants' alleged infringement

2    (or false affiliation or false advertising), <u>Herb Reed</u> does require it to present <u>some</u>

3    evidence of likely irreparable harm stemming from defendants' alleged misuse of the "ABD"

4    name.  Wells Fargo's counsel insists that proving such harm "is extremely difficult to do,"

5    but the difficulty of proving such harm does not relieve Wells Fargo of its evidentiary burden

6    under <u>Herb Reed</u>.  Moreover, even if Wells Fargo could show that it had lost (or was likely

7    to lose) business as a result of defendants' use of the "ABD" name, it is likely that such

8    harm could be remedied through monetary damages – as opposed to harm to reputation or

9    goodwill, which is less-easily quantified.  While Wells Fargo emphasizes the difficulty of

10   quantifying even the damages attributable to lost clients, the court presumes that Wells

11   Fargo will retain a damages expert to perform those calculations, and rejects Wells Fargo's

12   argument that "the difficulty in ascertaining [damages] is one of the reasons why there's

13   irreparable harm."  Dkt. 158 at 31-32.

14          Beyond the alleged lost business, Ms. Holt also claims in her declaration that "[t]o

15   the extent that the defendants' alleged misappropriation of the ABD mark contributed to the

16   loss of its brokers, this represents a loss of Wells Fargo's investment in its staff."  Dkt. 126,

17   ¶ 48.  Ms. Holt further alleges that "Wells Fargo was also forced to expend resources to

18   attract and train new brokers in an attempt to return the San Carlos office staff to its

19   preexisting capabilities."  <u>Id.</u>  However, Wells Fargo has not presented any evidence

20   showing that defendants' use of the "ABD" name is what caused the brokers to leave Wells

21   Fargo.  Thus, there is no evidence that the costs Wells Fargo incurred in re-staffing its

22   office are attributable to defendants' alleged infringement, false affiliation, or false

23   advertising.  More importantly, even if Wells Fargo were able to demonstrate such a link,

24   the costs of attracting and training new brokers are clearly capable of being remedied

25   through monetary damages.

26          In sum, Wells Fargo has not shown that it is likely to suffer irreparable harm absent

27   the "extraordinary remedy" of an injunction.  Wells Fargo has not presented any evidence

28   that its brand, reputation, and/or goodwill will be harmed by defendants' alleged trademark

23

1   infringement, false affiliation, and/or false advertising, and offers only the type of

2   "platitudes" that were rejected by the Ninth Circuit in <u>Herb Reed</u>.  Nor has Wells Fargo

3   shown that it has lost any business as the result of defendants' alleged trademark

4   infringement, false affiliation, and/or false advertising.  Moreover, even if Wells Fargo were

5   able to attribute any lost business to defendants' alleged trademark infringement, false

6   affiliation, and/or false advertising, Wells Fargo has not shown that such harm could not be

7   remedied through monetary damages.

8          Accordingly, the court need not address the remaining <u>Winter</u> factors, and Wells

9   Fargo's motion for preliminary injunction is DENIED.

10                                          **CONCLUSION**

11         For the reasons explained above, Wells Fargo's motion for preliminary injunction is

12  DENIED.  Because a significant amount of discovery has already occurred in this case, and

13  because the Ninth Circuit has already ruled on certain issues relevant to plaintiffs' claims,

14  the court will consider advancing the current June 3, 2015 deadline for dispositive motions

15  and the current October 2015 trial date.  The parties are directed to meet and confer

16  regarding pretrial deadlines, and may request a telephonic case management conference if

17  they desire to modify the current schedule.

18

19         **IT IS SO ORDERED.**

20  Dated: August 28, 2014

21                                          _____
                                            PHYLLIS J. HAMILTON
22                                          United States District Judge

23

24

25

26

27

28